**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMIT PATEL, | |
| Plaintiff, | |
| | Civil Action No.: _____--_____ |
| v. | |
| FAN DUEL, INC.; FLUTTER ENTERTAINMENT, PLC; FOX CORPORATION; BOYD GAMING CORP.; XYZ CORPS. 1-10; JANE AND JOHN DOES 1-10, | **COMPLAINT** |
| Defendants. | |

Plaintiff Amit Patel ("Plaintiff"), by way of a Complaint by and through his attorney Litt Law, LLC against the defendants Fan Duel, Inc., Flutter Entertainment, PLC, Fox Corporation, Boyd Gaming Corp., XYZ Corps. 1-10, and Jane and John Does 1-10 (Collectively "Defendants") does hereby state:

<u>INTRODUCTION</u>

Plaintiff gambled over $20 Million dollars with the Defendants on daily fantasy sports ("DFS") between late 2019 and early 2023. The Plaintiff was at all times relevant an addicted gambler, and was known by the Defendants to be an addicted gambler through, and among other things, the data it actively collected and monitored on his massive deposits, amounts bet, and frequency of bets. Defendants preyed on Plaintiff by using its information about his addiction to target him for enticements including well over a million dollars in FanDuel credits and lavish gifts to ensure that he deposit money and gamble in amounts and frequencies that only an addict could ever gamble.

Part of Defendants' predatory gambling practice was intentionally ignoring its own responsible gaming protocol, and knowing and/or taking intentional steps to avoid knowing that the money gambled by Plaintiff was stolen or otherwise not from a legitimate source. Defendants circumvented its own Know Your Customer (KYC), anti-money laundering (AML), and customer due diligence (CDD) standards and requirements -- again to ensure that Plaintiff continue depositing and gambling in massive amounts and frequencies.

To be clear, this suit does not allege liability on the basis that Defendants passively permitted an addicted gambler to use its platform. Rather, this suit alleges violation of statutory and common law because Defendants actively and intentionally targeted and preyed on Plaintiff with incentives, credits, and gifts to create, nurture, expedite, and/or exacerbate his addiction with the only possible outcome that he would ultimately hit rock bottom.

<u>THE PARTIES</u>

1.      At all relevant times, the Plaintiff was an individual residing in the State of Florida, City of Jacksonville, suffering from gambling addiction disorder.

2.      Plaintiff is presently a resident of the State of South Carolina, Town of Salters.

3.      Plaintiff is presently incarcerated at the Williamsburg Federal Correctional Institution Satellite Camp for a term of six and a half years as the result of the transactions underlying this litigation.

4.      At all times relevant, Plaintiff was an employee of the Jacksonville Jaguars, a member of the National Football League.

5.      At all times relevant, Plaintiff was a well-respected and well-liked employee of the Jacksonville Jaguars.

6.     At all times relevant, the Defendant FanDuel was an Official Sports Betting Partner of the National Football League.

7.     As an Official Sports Betting Partner of the National Football League, Defendant FanDuel agreed to adhere to the National Football League's core integrity policies, and agreed to collaborate with the National Football League on intelligence sharing, advocacy efforts, and responsible gaming education.

8.     Upon information and belief, Defendants knew that the Plaintiff was employed by the Jacksonville Jaguars.

9.     Plaintiff was designated by Defendants for its VIP status in or about 2021, and assigned VIP host Brett Krause ("Krause").

10.     Plaintiff and Krause often communicated as much as 100 times every day between late 2021 and early 2023.

11.     On several occasions, Defendants contacted Plaintiff through Krause on a day he was not gambling to find out why he was not gambling.

12.     On several occasions, Defendants contacted Plaintiff through Krause to offer him free DFS contest entries if he placed the maximum 150 entries into a single DFS contest.

13.     Communications from Defendants, through Krause, to Plaintiff frequently began first thing in the morning, and continued throughout the day until late at night.

14.     Krause accompanied the Plaintiff on more than one trip sponsored by the Defendants; Krause's girlfriend even joined Krause and Plaintiff on one of these trips.

15.     Defendants manipulated Plaintiff for the purpose of, and among other things, helping Defendants fill its most expensive DFS contests.

16.     At all times relevant to this Complaint, Plaintiff engaged in DFS activity with Defendants while within the borders of the State of Florida.

17.     The Defendant FanDuel, Inc. is a foreign gambling company incorporated in Delaware in 2015 that offers sportsbook, DFS, horse racing, and online casino gambling in multiple states across the United States, with its headquarters located at 300 Park Avenue South, 14th Floor, in the City and State of New York.

18.     At all relevant times to this Complaint, FanDuel, Inc.'s products/services in Florida were limited to DFS.

19.     FanDuel, Inc. is and was at all relevant times one of the United States' largest providers of DFS and sports betting.

20.     Upon information and belief, FanDuel generated $3.23 Billion dollars in gambling revenue in 2022, and $4.4 billion in gambling revenue in 2023.

21.     Flutter Entertainment, PLC is a publicly traded company which owns, in whole or in part, several gambling companies including, but not limited to, FanDuel, Inc., with its headquarters located in the City of Dublin, Country of Ireland, and domestic headquarters located at 300 Park Avenue South in the City and State of New York.

22.     Upon information and belief, Flutter Entertainment, PLC generated $11.7 Billion dollars in gambling revenue in 2023.

23.     Fox Corporation is a publicly traded company, and is the partial owner of FanDuel, Inc., with its headquarters located at 1211 Avenue of the Americas, in the City and State of New York.

24.     Boyd Gaming is a publicly traded gambling company, and is the partial owner of FanDuel, Inc., with its headquarters located in Las Vegas, Nevada.

25.    John Does 1-10 and Mary Does 1-10 are individuals whose identities are presently unknown to Plaintiff responsible for all or part of the acts and omissions complained of herein.

26.    XYZ Corporations 1-10 are entities whose identities are presently unknown to Plaintiff responsible for all or part of the acts and omissions complained of herein.

27.    Brett Krause ("Krause") was a VIP Account Manager employed by the Defendants, responsible for retaining and maximizing the profitability of Defendants' VIP online gaming and gambling customers.

<u>JURISDICTION AND VENUE</u>

28.    The District Court has original jurisdiction over the instant civil matter pursuant to 28 U.S.C. § 1332 (a)(1) and (2) because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and is between citizens of different States and citizens of a State and subject of a foreign state.

29.    Venue in the Southern District of New York is appropriate pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events and omissions giving rise to the claims occurred at the headquarters of Defendant FanDuel, Inc., located in the City and State of New York, and because Defendant FanDuel, Inc. is subject to the court's personal jurisdiction.

30.    Venue in the Southern District of New York is further appropriate pursuant to 28 U.S.C. § 1391(d) because the contacts of FanDuel, Inc. are sufficient to subject it to personal jurisdiction if the Southern District of New York were a separate state.

<u>GAMBLING ADDICTION DISORDER</u>

31.    At all times relevant to this Complaint the Plaintiff was, and exhibited fundamental symptoms of being addicted to gambling.

32.    These symptoms included, but were not necessarily limited to, the massive amount of money deposited and wagered by Plaintiff on Defendants' DFS contests, massive frequency of wagers placed by Plaintiff on Defendants' DFS contests, exponential growth in money wagered and DFS contests entered with Defendants, Plaintiff's demonstrated preoccupation with gambling on Defendants' DFS contests, Plaintiff's gambling with increasing amounts of money on the Defendants' DFS contests to chase his losses, binge gambling on Defendants' DFS contests, Plaintiff's cancellation of his own withdrawals on the Defendants' site, the massive amount of time spent on the Defendants' site.

33.    Plaintiff was diagnosed with severe gambling disorder by the Florida Recovery Center in or about April 2023, and has not placed a bet since March 21, 2023.

34.    Gambling addiction, also referred to as problem gambling, is classified by both the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders and World Health Organization's International Classification of Diseases as an addiction disorder alongside alcohol and drug addictions.

35.    At all times relevant to this Complaint, the Defendants were trained in the recognition of the nature and symptoms of problem gambling behavior.

36.    At all times relevant to this Complaint, the Defendants knew, whether by training and/or practice, the nature and symptoms of problem gambling behavior.

37.    At all times relevant to this Complaint the Defendants knew, whether by training and/or practice, that between 70% – 80% of addicted gamblers will commit a felony to obtain money with which to gamble.

38.    Defendants' involvement in Plaintiff's gambling addiction was not passive.

39.     Defendants knew Plaintiff was an addicted gambler because from approximately late 2019 through early 2023, they engaged with him through email, telephone, and text message on an almost daily basis.

40.     The communication between Defendants and Plaintiff was done primarily through the Defendants' VIP host, Brett Krause ("Krause").

41.     Upon information and belief, Defendants knew, through Krause, that the Plaintiff worked for a National Football League team and was not permitted to gamble on the National Football League.

42.     Defendants exploited Plaintiff's problem gambling disorder to his detriment and for its own benefit by ceaselessly enticing Plaintiff to deposit and gamble massive amounts of money.


ENTICEMENTS

43.     Defendants' enticements to Plaintiff to gamble included relentless financial incentives, lavish trips, event tickets, and other gifts.

44.     Such enticement from the Defendants included approximately $1,107,883 in FanDuel credit.

45.     Such enticement from the Defendants included a system whereby Amit was incentivized by Defendants to continue reaching deposits of at least $600,000 to attain a FanDuel credit of $60,000.

46.     The $60,000 in FanDuel credit was delivered by Defendants through a series of three payments of $25,000, $25,000, and $10,000 to avoid the suspicions of Defendants' own compliance personnel.

47.    This incentivization mechanism was created by the Defendants specifically for the Plaintiff.

48.    Such enticement from the Defendants included, but was not limited to, an all-expense reimbursed trip to a Formula One Grand Prix event in Miami.

49.    Such enticement from the Defendants included, but was not limited to, an all-expense reimbursed trip, plus a lavish suite, to the National Collegiate Athletic Association's football National Championship game in January 2023.

50.    Such enticement from the Defendants included, but was not limited to, a lavish all-expense paid trip to the Masters Tournament in 2021 and 2022.

51.    Such enticement from the Defendants included, but was not limited to, the offer of an all-expense paid trip to the National Football League's Super Bowl.

52.    Such enticement from the Defendants included, but was not limited to, smaller gifts such as a customized basketball jersey with the Plaintiff's FanDuel username on the nameplate.

52a.    Such trips and gifts were intended by Defendants to entice Plaintiff to continue to gamble and at greater and amounts and frequencies by creating the illusion that Plaintiff was a successful gambler.

53.    Plaintiff ultimately gambled over $20 Million with Defendants from late 2019 and early 2023, as his gambling addiction disorder was exploited by Defendants and grew progressively worse.

54.    The Defendants' relentless enticements of the Plaintiff to gamble when they knew he suffered from gambling addiction and/or exhibited the signs of a problem gambler was an unconscionable act or practice and/or unfair or deceptive act or practice in violation of the Florida Deceptive and Unfair Trade Practices Act.

55.     The Defendants' conduct in targeting a person known by them to be an addicted gambler for relentless enticements to gamble in greater amounts and frequency was intentional, reckless, and outrageous.

56.     Contrary to living a luxurious lifestyle, Plaintiff's addiction caused him constant agony in the years between 2019 and 2023.

57.     The Plaintiff's judgment was severely affected by his gambling addiction when he began using his employer's credit card to deposit funds with which to gamble.


DEFENDANTS' COMPLIANCE PROGRAM

58.     The Defendants knew, and/or took intentional steps to avoid knowing that the money gambled by Plaintiff was stolen or otherwise not from a legitimate source.

59.     The Defendants are a "financial institution" as that term is defined by the federal Bank Secrecy Act (BSA).

60.     As a "financial institution," Defendants are required to file Currency Transaction Reports for all transactions over $10,000.

61.     Plaintiff made over 1,000 transactions with Defendants in excess of $10,000.

62.     As a "financial institution," Defendants are required to comply with federal Know Your Customer (KYC), anti-money laundering (AML), and customer due-diligence (CDD) guidelines and rules.

63.     To fulfill its obligations as a "financial institution," Defendants were at all times relevant to the Complaint required to have a program in place to: a) identify and verify the identity of its customers, b) understand the nature and purpose of customer relationships and develop risk profiles, and c) continuously monitor to identify and report suspicious transactions ("Program").

64.    At all times relevant to this Complaint, Defendants did, in fact, have a Program in place.

65.    In or about early 2023, the Defendants' identified one or more of the Plaintiff's transactions as suspicious.

66.    As a result of the identification set forth in the immediately preceding paragraph, Defendants told Plaintiff through Krause that he would have to verify the source of funds being deposited with its site for gambling.

67.    More specifically, the Plaintiff's VIP host informed Plaintiff that Defendants' AML department required a verification of his source of funds.

68.    Days later, and without Plaintiff providing verification of any kind, Defendants informed Plaintiff that "Defendants got around it" and "you owe me big time" or words to that effect, and that Defendants were no longer requesting verification.

69.    The Defendants ignored the transaction(s) they identified as suspicious to keep Plaintiff, who they knew to be an addicted gambler, depositing and gambling on its site in massive amounts and frequency.

70.    Defendants set deposit limits for consumers as part of the Program, above which verification of a gambler's source of funds is required.

71.    DraftKings, for example, imposed and enforced a $30,000 per month deposit limit on the Plaintiff.

72.    Plaintiff exceeded the deposit limits referenced in the immediately preceding paragraph, without ever verifying his source of funds.

73.    Upon information and belief, Defendants knew, or at least suspected and took steps to intentionally ignore, that the Plaintiff was using a corporate credit card to make frequent massive deposits with Defendants.

74.    Defendants received deposits from Plaintiff in amounts which could only have come from a corporate credit card.

75.    As part of the Program, Defendants are not permitted to refund deposits or partial deposits onto the same credit card from which the deposits originated unless the player is net-positive.

76.    Krause acknowledged to Plaintiff on numerous occasions that Defendants were "breaking AML by giving refunds back to the credit card" or words to that effect.

77.    In violation of the Program, Defendants continually refunded deposits or partial deposits onto the same credit card from which Plaintiff's deposits originated.

78.    Such refunds occurred nearly 300 times, with each refund in the amount of $25,000 for a total of approximately $6,750,000.

79.    Defendants knowingly and intentionally circumvented KYC, AML, CDD, and its own Program's requirements and guidelines to keep Plaintiff gambling on its site, despite knowing that Plaintiff was an addicted gambler and that he was using money that was stolen or otherwise not from a legitimate source.

## DEFENDANTS' DFS BUSINESS

80.    DFS is an online game where gamblers choose a team of real-life athletes and compete against other gamblers in a single day contest to see which team of real-life athletes produces the best results.

81.    Upon information and belief, Defendants keep 6% of all money wagered on DFS.

82.    Typically, up to thousands of gamblers will compete against each other in a single DFS contest.

83.    However, most of the money gambled and lost by the Plaintiff was gambled and lost on 3-person DFS contests with entry fees between $10,600 and $530,000.

84.    Entry into 3-person DFS contests above $26,200 were specially arranged for Plaintiff by the Defendants through its VIP host, and not readily available to the public.

85.    Defendants arranged 100s of such custom DFS contests for the Plaintiff.

86.    In order to find two other gamblers to play with Plaintiff in these 3-person DFS contests, Defendants permitted and/or ignored suspected collusion between the other two players.

87.    Plaintiff told Defendants that the other two players were colluding.

88.    Defendants acknowledged, through Krause, that the other two players' behavior was suspicious, but claimed there was nothing they could do.

89.    Plaintiff's entry into contests which he knew and told Defendants he believed to be colluded was another sign known to Defendants that Plaintiff was an addicted gambler.

90.    Krause disclosed to Plaintiff that Defendants' DFS business was waning.

91.    Defendants knowingly and intentionally permitted collusion to keep Amit gambling on its site, because Defendants knew that Plaintiff was an addicted gambler and wanted to keep him gambling on its site in greater amounts and frequency.


## FUNDAMENTAL AND VISIBLE SYMPTOMS OF PROBLEM GAMBLING

92.    Beginning in or about late 2019, Plaintiff began using stolen money to gamble on DFS contests on the Defendants' online gaming platform.

93.    Plaintiff deposited more than $20,000,000 of stolen money on the Defendants' online gaming platform.

94.    The stolen money was deposited through approximately 1,077 deposits.

95.    Each of the 1,077 deposits were in the amount of $25,000.

96.    There were several days on which the Plaintiff made as many as 10 separate deposits of $25,000 each.

97.    Plaintiff repaid hundreds of thousands of dollars per month back into the account from which the money was stolen.

98.    Defendants' Program recognized the deposits as suspicious, but intentionally disregarded these suspicions to ensure that the Plaintiff, whom they knew to be an addicted gambler, continue depositing and gambling in high amounts and frequencies.

99.    Defendants at all times relevant maintained and monitored precise records and data about Plaintiff and other patrons' gambling patterns and behavior. Defendants maintain analytic tools, software, and player tracking data for VIP gamblers such as Plaintiff for the purpose of maximizing the deposits elicited from such customers.

100.    At all times relevant to this Complaint, Defendants recognized the nature and symptoms of problem gambling behavior generally, through training and/or practice.

101.    At all times relevant to this Complaint, Defendants recognized that Plaintiff specifically displayed the hallmark symptoms of a problem gambler.

102.    The amount of money Plaintiff gambled with the Defendants between late 2019 and early 2023 was a fundamental and visible symptom of problem gambling.

103.    At all times relevant, Defendants knew how much money the Plaintiff was depositing and gambling.

104.    Defendants recognized that the amount of money Plaintiff gambled with Defendants between late 2019 and early 2023 as fundamental symptom of problem gambling.

105.    Defendants did, in fact, recognize that the amount of money Plaintiff gambled with Defendants between late 2019 and early 2023 as a fundamental symptom of problem gambling.

106.    Defendants knew that Plaintiff was a problem gambler based on the amount of money he deposited and gambled with them between late 2019 and early 2023.

107.    Plaintiff submitted at least tens of thousands of DFS entries with the Defendants between late 2019 and early 2023.

108.    The frequency with which Plaintiff gambled with the Defendants between late 2019 and early 2023 was a fundamental and visible symptom of problem gambling.

109.    At all times relevant, Defendants knew the frequency with which the Plaintiff was gambling.

110.    Defendants were capable of recognizing, through training and/or experience, that the frequency with which Plaintiff gambled between late 2019 and early 2023 was a fundamental symptom of problem gambling.

111.    Defendants did, in fact, recognize that the frequency with which Plaintiff gambled between late 2019 and early 2023 was a fundamental symptom of problem gambling.

112.    Defendants knew that Plaintiff was a problem gambler based on the frequency with which he gambled between late 2019 and early 2023.

113.    "Chasing losses" is the act of increasing the amount of money bet or the number of bets placed by a gambler in an effort to recoup prior losses.

114.    Plaintiff's chasing of his losses with the Defendants between late 2019 and early 2023 was a fundamental and visible symptom of problem gambling.

115.    At all times relevant, Defendants knew that Plaintiff was chasing his losses with them to return money to the same source from where it came.

116.    Defendants were capable of recognizing, through training and/or experience, that Plaintiff's chasing of his losses with Defendants between late 2019 and early 2023 was a fundamental symptom of problem gambling.

117.    Defendants did, in fact, recognize that Plaintiff's chasing of his losses with Defendants between late 2019 and early 2023 was a fundamental symptom of problem gambling.

118.    Defendants knew that Plaintiff was a problem gambler based on his chasing losses with them between late 2019 and early 2023.

119.    The Plaintiff's preoccupation with gambling, including but not limited to engaging in as many as 100 text messages per day with his VIP host between late 2019 and early 2023 was a fundamental and visible symptom of problem gambling.

120.    At all times relevant, Defendants were aware of Plaintiff's preoccupation with gambling through as many as 100 text messages per day with his VIP host between late 2019 and early 2023.

121.    Krause moved certain of his text messages with Plaintiff to Krause's personal cell phone to avoid detection by FanDuel's compliance personnel, while instructing Plaintiff to fabricate additional back-and-forth dialogue on his FanDuel phone to make sure it appeared to FanDuel that their communication remained frequent.

122.    Defendants were capable of recognizing, through training and/or experience, that Plaintiff's preoccupation with gambling was a fundamental symptom of problem gambling.

123.    Defendants did, in fact, recognize that Plaintiff's preoccupation with gambling between late 2019 and early 2023 was a fundamental symptom of problem gambling.

124.    The Plaintiff's use of suspicious funds to gamble was a fundamental and visible symptom of problem gambling.

125.    Defendants knew and/or took intentional steps to avoid knowing that Plaintiff was stealing funds with which to gamble.

126.    Defendants were capable of recognizing, through training and/or experience, that Plaintiff's stealing of funds with which to gamble was a fundamental symptom of problem gambling.

127.    Defendants did, in fact, recognize that Plaintiff's stealing of funds with which to gamble was a fundamental symptom of problem gambling.

128.    A "cooling-off" period whereby a gambler takes a break from gambling is a recognized and fundamental way to help a problem gambler with his or her addiction.

129.    Defendants knew that a cooling-off period away from gambling was a recognized and fundamental way to help a problem gambler with his or her addiction.

130.    Krause's job with Defendants included preventing VIP players from taking any cooling-off period.

131.    Defendants rewarded Krause for preventing VIP players from taking any cooling-off period.

132.    Krause's job included maximizing the amount of money VIP gamblers gambled with Defendants.

133.    Krause's job included maximizing the amount of money Plaintiff gambled with Defendants.

134.    Krause's job included the development of a quasi-personal relationship with gamblers so that they felt comfortable with and trusted him, allowing Krause to manipulate Plaintiff and other addicted gamblers.

135.    Krause's job included the development of a quasi-personal relationship with the Plaintiff so that Plaintiff felt comfortable with and trusted him.

## CHRONOLOGY OF FANDUEL CREDIT ENTICEMENTS

136.    Between late 2019 and early 2023, Defendants actively and relentlessly enticed the Plaintiff, whom they knew to be addicted to gambling, to ensure that he continue to deposit and gamble on its site in massive amounts and frequency.

137.    These enticements included, but were not limited to, a total of well over $1,000,000 in FanDuel credits intended to keep Plaintiff depositing and gambling in massive amounts and frequency.

138.    Such enticement included, but was not limited to, a $12,720 FanDuel credit on February 21, 2021.

139.    Such enticement included, but was not limited to, a $25,000 FanDuel credit on March 1, 2021.

140.    Such enticement included, but was not limited to, a $6,291 FanDuel credit on April 4, 2021, followed by a $6,460 and then a $4,342 FanDuel credit on the same day.

141.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on April 10, 2021.

142.    Such enticement included, but was not limited to, a $20 FanDuel credit on April 12, 2021, followed by a $500 and then a $1,023 FanDuel credit on the same day.

143.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on April 14, 2021.

144.    Such enticement included, but was not limited to, a $7,500 FanDuel credit on April 15, 2021.

145.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on April 18, 2021.

146.    Such enticement included, but was not limited to, a $620 FanDuel credit on April 20, 2021.

147.    Such enticement included, but was not limited to, a $1,000 FanDuel credit on April 24, 2021.

148.    Such enticement included, but was not limited to, a $20,000 FanDuel credit on April 25, 2021.

149.    Such enticement included, but was not limited to, a $3,600 FanDuel credit on May 5, 2021.

150.    Such enticement included, but was not limited to, a $900 FanDuel credit on May 12, 2021.

151.    Such enticement included, but was not limited to, a $544 FanDuel credit on May 17, 2021, followed by a $19,000 FanDuel credit on the same day.

152.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on June 1, 2021, followed by a $27,000 gambling credit on the same day.

153.    Such enticement included, but was not limited to, a $3,271 FanDuel credit on June 4, 2021.

154.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on June 10, 2021.

155.    Such enticement included, but was not limited to, a $2,200 FanDuel credit on June 21, 2021, followed by a $20,000 FanDuel credit on the same day.

156.    Such enticement included, but was not limited to, a $9,000 FanDuel credit on June 25, 2021.

157.    Such enticement included, but was not limited to, a $15,000 FanDuel credit on July 1, 2021.

158.    Such enticement included, but was not limited to, a $20,000 FanDuel credit on July 19, 2021.

159.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on July 27, 2021, followed by a $20,000 FanDuel credit on the same day.

160.    Such enticement included, but was not limited to, a $15,000 FanDuel credit on August 4, 2021.

161.    Such enticement included, but was not limited to, a $25,200 FanDuel credit on August 10, 2021.

162.    Such enticement included, but was not limited to, a $15,000 FanDuel credit on August 12, 2021.

163.    Such enticement included, but was not limited to, a $20,000 FanDuel credit on August 20, 2021.

164.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on September 6, 2021.

165.    Such enticement included, but was not limited to, a $500 FanDuel credit on September 8, 2021.

166.    Such enticement included, but was not limited to, a $500 FanDuel credit on September 8, 2021.

167.    Such enticement included, but was not limited to, a $1,000 FanDuel credit on October 25, 2021.

168.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on October 19, 2021.

169.    Such enticement included, but was not limited to, a $7,500 FanDuel credit on October 23, 2021.

170.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on October 26, 2021.

171.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on October 26, 2021.

172.    Such enticement included, but was not limited to, a $10,600 FanDuel credit on November 1, 2021.

173.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on November 3, 2021.

174.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on November 5, 2021.

175.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on November 26, 2021.

176.    Such enticement included, but was not limited to, a $7,500 FanDuel credit on November 27, 2021.

177.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on November 29, 2021.

178.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on December 5, 2021.

179.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on December 6, 2021.

180.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on December 13, 2021.

181.    Such enticement included, but was not limited to, a $22,500 FanDuel credit on December 14, 2021.

182.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on December 17, 2021.

183.    Such enticement included, but was not limited to, a $264 FanDuel credit on December 20, 2021, followed by a $5,036 FanDuel credit on the same day.

184.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on December 21, 2021.

185.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on December 25, 2021.

186.    Such enticement included, but was not limited to, a $3,200 FanDuel credit on December 28, 2021.

187.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on December 29, 2021.

188.    Such enticement included, but was not limited to, a $7,500 FanDuel credit on January 2, 2022.

189.    Such enticement included, but was not limited to, a $15,000 FanDuel credit on January 17, 2022.

190.    Such enticement included, but was not limited to, a $10,500 FanDuel credit on January 23, 2022.

191.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on January 30, 2022.

192.    Such enticement included, but was not limited to, a $2,380 FanDuel credit on February 8, 2022, followed by a $4,500 gambling credit on that same day.

193.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on February 24, 2022.

194.    Such enticement included, but was not limited to, a $2,650 FanDuel credit on February 12, 2022.

195.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on February 19, 2022.

196.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on February 22, 2022.

197.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on February 24, 2022.

198.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on March 3, 2022.

199.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on March 16, 2022.

200.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on March 20, 2022.

201.    Such enticement included, but was not limited to, a $530 FanDuel credit on March 21, 2022.

202.    Such enticement included, but was not limited to, a $5,000 FanDuel credit on March 22, 2022.

203.    Such enticement included, but was not limited to, a $2,000 FanDuel credit on March 30, 2022.

204.    Such enticement included, but was not limited to, a $500 FanDuel credit on April 11, 2022, followed by a second $500 FanDuel credit on the same date.

205.    Such enticement included, but was not limited to, a $4,000 FanDuel credit on May 2, 2022.

206.    Such enticement included, but was not limited to, an $800 FanDuel credit on May 10, 2022.

207.    Such enticement included, but was not limited to, a $15,000 FanDuel credit on May 13, 2022.

208.    Such enticement included, but was not limited to, a $1,350 FanDuel credit on May 16, 2022.

209.    Such enticement included, but was not limited to, a $13,350 FanDuel credit on May 23, 2022.

210.   Such enticement included, but was not limited to, a $15,000 FanDuel credit on May 24, 2022.

211.   Such enticement included, but was not limited to, a $42,000 FanDuel credit on June 6, 2022.

212.   Such enticement included, but was not limited to, a $30,000 FanDuel credit on June 7, 2022.

213.   Such enticement included, but was not limited to, a $33,750 FanDuel credit on June 17, 2022

214.   Such enticement included, but was not limited to, a $15,000 FanDuel credit on June 19, 2022.

215.   Such enticement included, but was not limited to, a $50,000 FanDuel credit on July 3, 2022.

216.   Such enticement included, but was not limited to, a $4,800 FanDuel credit on July 14, 2022.

217.   Such enticement included, but was not limited to, a $25,000 FanDuel credit on August 1, 2022, followed by a $10,000 FanDuel credit on that same date.

218.   Such enticement included, but was not limited to, a $10,000 FanDuel credit on August 2, 2022.

219.   Such enticement included, but was not limited to, a $10,000 FanDuel credit on August 17, 2022.

220.   Such enticement included, but was not limited to, a $5,900 FanDuel credit on August 30, 2022.

221.    Such enticement included, but was not limited to, a $2,500 FanDuel credit on September 1, 2022.

222.    Such enticement included, but was not limited to, a $25,000 FanDuel credit on September 8, 2022.

223.    Such enticement included, but was not limited to, a $7,500 FanDuel credit on September 12, 2022.

224.    Such enticement included, but was not limited to, a $25,000 FanDuel credit on September 13, 2022.

225.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on September 14, 2022.

226.    Such enticement included, but was not limited to, a $25,000 FanDuel credit on October 3, 2022.

227.    Such enticement included, but was not limited to, a $25,000 FanDuel credit on October 7, 2022.

228.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on October 10, 2022.

229.    Such enticement included, but was not limited to, a $25,000 FanDuel credit on November 6, 2022.

230.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on November 8, 2022.

231.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on November 10, 2022.

232.     Such enticement included, but was not limited to, a $10,000 FanDuel credit on November 12, 2022.

233.     Such enticement included, but was not limited to, a $5,000 FanDuel credit on November 14, 2022.

234.     Such enticement included, but was not limited to, a $25,000 FanDuel credit on December 1, 2022.

235.     Such enticement included, but was not limited to, a $10,000 FanDuel credit on December 3, 2022.

236.     Such enticement included, but was not limited to, a $10,000 FanDuel credit on December 4, 2022.

236.     Such enticement included, but was not limited to, a $10,000 FanDuel credit on December 5, 2022.

237.     Such enticement included, but was not limited to, a $10,000 FanDuel credit on December 6, 2022.

238.     Such enticement included, but was not limited to, a $10,000 FanDuel credit on January 6, 2023.

239.     Such enticement included, but was not limited to, a $10,000 FanDuel credit on January 11, 2023.

240.     Such enticement included, but was not limited to, a $10,000 FanDuel credit on January 12, 2023.

241.     Such enticement included, but was not limited to, a $10,000 FanDuel credit on January 14, 2023.

242.    Such enticement included, but was not limited to, a $10,000 FanDuel credit on January 16, 2023.

243.    These FanDuel credits were given by the Defendants for the purpose of enticing the Plaintiff to continue to deposit and gamble in massive amounts and frequency, despite knowing he exhibited hallmark symptoms of being, and was in fact, an addicted gambler.

244.    On multiple occasions Defendants, through Krauss, instructed Plaintiff on ways to circumvent Defendants' own program by instructing him to gamble the FanDuel credit in his account instead of withdrawing it to avoid suspicion.

245.    The Defendants' creation, nurturing, expediting, and/or exacerbation of the Plaintiff's gambling addiction was the proximate cause, in whole or in part, of damages to the Plaintiff including, but not necessarily limited to pecuniary losses in an amount to be determined at trial, inclusive of: a) monies lost, b) severe emotional distress resulting from Plaintiff's addiction, anticipation of punishment, and imprisonment, c) repayment of stolen funds paid and owed, inclusive of any penalties and interest, and d) the complete devastation of the Plaintiff's professional, personal, and financial life.


## FIRST COUNT
### Violation of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq.*
### (As Against All Defendants)

246.    Plaintiff hereby incorporates and restates the allegations contained in all previous paragraphs as if set forth again at full length herein.

247.    At all relevant times, the Plaintiff was an "interested party or person" as that term is defined by § 501.203(6) of the Florida Deceptive and Unfair Trade Practices Act.

248.    At all relevant times, the Plaintiff was a "consumer" as that term is defined by § 501.203(7) of the Florida Deceptive and Unfair Trade Practices Act.

249.    At all relevant times, Defendants were engaged in "trade or commerce" as that term is defined by § 501.203(8) of the Florida Deceptive and Unfair Trade Practices Act.

250.    The transactions described in this Complaint constituted "trade or commerce" as that term is defined by § 501.203(8) of the Florida Deceptive and Unfair Trade Practices Act.

251.    The Defendants' active and relentless enticements of the Plaintiff to continue depositing money to gamble on its platform when they knew he exhibited fundamental signs of gambling addiction was an unconscionable act or practice and/or unfair or deceptive act or practice in the conduct of trade or commerce under § 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act.

252.    The Defendants' provision of gifts to the Plaintiff which defendants knew would have the effect of creating, nurturing, expediting, and/or exacerbating the Plaintiff's gambling addiction was an unconscionable act or practice and/or unfair or deceptive act or practice in the conduct of trade or commerce under § 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act.

253.    The Defendants' circumvention of its own Program, KYC, AML, and CDD requirements and guidelines to ensure Plaintiff continue depositing money to gamble on its platform when they knew he exhibited fundamental signs of gambling addiction was an unconscionable act or practice and/or unfair or deceptive act or practice in the conduct of trade or commerce under § 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act.

254.    The Defendants' acceptance of suspected collusion between players in DFS games involving the Plaintiff, through which Plaintiff lost millions of dollars, to ensure Plaintiff continue depositing money to gamble on its platform when they knew he exhibited fundamental

signs of gambling addiction was an unconscionable act or practice and/or unfair or deceptive act or practice in the conduct of trade or commerce under § 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act.

255.    As a result of the Defendants' misconduct, the Plaintiff suffered ascertainable loss.

256.    The Plaintiff brings this action pursuant to the Florida Deceptive and Unfair Trade Practices Act and, in accordance therewith, is entitled to actual compensatory damages in an amount to be determined at the time of trial, plus attorney fees, and court costs.

WHEREFORE, the Plaintiff demands Judgment against Defendants in the amount of $250,000,000 for: a) compensatory damages, b) together with interest, d) reasonable attorney's fees and costs of suit, and e) for such further relief as this Court deems just and equitable.

## SECOND COUNT
### Negligence
### (As Against all Defendants)

257.    Plaintiff hereby incorporates and restates the allegations contained in all previous paragraphs as if set forth again at full length herein.

258.    The Defendants owed Plaintiff a duty of care.

259.    Defendants breached their duty of care to Plaintiff by making ongoing inducements to gamble while Defendants knew or should have known that the Plaintiff was a compulsive gambler.

260.    Defendants breached their duty of care to the Plaintiff by initiating a long series of enticements to gamble which Defendants knew or should have known would have the effect of creating, nurturing, expediting, and/or exacerbating the Plaintiff's gambling addiction, and by

enticing Plaintiff to participate in DFS contests which it knew or should have known was subject to collusion.

261.    The Defendants' breach(s) of its duty of care was the actual and proximate cause of the Plaintiff's damages, in whole or in part.

WHEREFORE, the Plaintiff demands judgment against the Defendants in the amount of $250,000,000 for: a) compensatory damages and b) punitive damages, together with c) interest, costs of suit, and such further and other relief as this Court deems just and equitable.

### THIRD COUNT
**Intentional Infliction of Emotional Distress**
**(As Against All Defendants)**

262.    Plaintiff hereby incorporates and restates the allegations contained in all previous paragraphs as if set forth again at full length herein.

263.    The conduct of the Defendants as described herein was intentional and reckless.

264.    The conduct of the Defendants as described herein was outrageous, and goes beyond all bounds of decency and is intolerable in a civilized community.

265.    The conduct of the Defendants, in whole or in part, caused the Plaintiff to suffer severe emotional distress.

266.    The Plaintiff's severe emotional distress was the foreseeable result of the Defendants' acts.

WHEREFORE, the Plaintiff demands judgment against the Defendants in the amount of $250,000,000 for: a) compensatory damages, b) punitive damages, together with c) interest, costs of suit, and such further and other relief as this Court deems just and equitable.

**FOURTH COUNT**
**Conspiracy to Commit Tort**
**(As Against All Defendants)**

267.    Plaintiff hereby incorporates and restates the allegations contained in all previous paragraphs as if set forth again at full length herein.

268.    The conduct of the Defendants as described herein was tortious.

269.    There was an agreement between two or more parties to provide Plaintiff with enticements to deposit and gamble when they knew he exhibited fundamental signs of gambling addiction.

270.    Overt acts were taken in furtherance of this agreement in the form of, and among other things, all-expense paid trips and the relentless gambling credit enticements described herein.

271.    There was an agreement between two or more parties to circumvent its own Program, KYC, AML, and CDD requirements and guidelines to ensure Plaintiff begin and continue depositing money to gamble on its platform when they knew he exhibited fundamental signs of gambling addiction.

272.    Overt acts were taken in furtherance of this agreement in the form of, and among other things, Defendants' manipulation of its requirement for a verification of Plaintiff's source of funds.

273.    Defendants conspired to breach their duty of care to the Plaintiff by initiating a long series of enticements to gamble which Defendants knew or should have known would have the effect of creating, nurturing, expediting, and/or exacerbating the Plaintiff's gambling addiction, and by enticing Plaintiff to participate in DFS contests which it knew or should have known was subject to collusion.

274.    The conduct of the Defendants, in whole or in part, caused the Plaintiff's damages including, but not limited to: a) monies lost, b) severe emotional distress resulting from Plaintiff's addiction, anticipation of punishment, and imprisonment, c) repayment of stolen funds paid and owed, inclusive of any penalties and interest, and d) the complete devastation of the Plaintiff's professional, personal, and financial life.

WHEREFORE, the Plaintiff demands judgment against the Defendants in the amount of $250,000,000 for: a) compensatory damages, b) punitive damages, together with c) interest, costs of suit, and such further and other relief as this Court deems just and equitable.

Dated: October 1, 2024

LITT LAW, LLC

_____
By: Matthew R. Litt, Esq.
Mailing Address:
789 Farnsworth Avenue
Bordentown, New Jersey 08505
Phone: (908) 902-7071
MLitt@LittLaw.Net