**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| AMIT PATEL,<br><br>                    Plaintiff,<br><br>     v.<br><br>FAN DUEL, INC., FLUTTER<br>ENTERTAINMENT, PLC,<br>FOX CORPORATION, BOYD GAMING<br>CORP., XYZ CORPS. 1-10, JANE AND JOHN<br>DOES 1-10,<br><br>                    Defendants. | CASE NUMBER: 1:24-CV-07402-VSB<br><br>**ORAL ARGUMENT REQUESTED** |

<u>**MEMORANDUM IN SUPPORT OF FANDUEL, INC.'S**</u>
<u>**MOTION TO COMPEL ARBITRATION AND STAY THE CASE**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................iii

BACKGROUND ............................................................................................. 1

    I.     The Amended Complaint................................................................ 1

    II.    Patel's Arbitration Agreements .................................................... 2

ARGUMENT .................................................................................................. 5

    I.     Patel's Agreements with FanDuel Require Arbitration of His
         Claims. ........................................................................................ 6

         A.     Patel and FanDuel Entered Binding Agreements to
              Arbitrate. .......................................................................... 7

              1.     FanDuel's conspicuous warning, "By signing up,
                     you . . . agree to the Terms of Use," put a
                     reasonable user on notice of the agreement. ........... 8

              2.     Patel manifested assent to the agreement by
                     signing up to play............................................... 13

              3.     In 2020, Patel was again put on notice of the
                     arbitration agreement via email and manifested
                     assent by continuing to play Daily Fantasy Sports. ............... 13

         B.     These Agreements Require the Arbitrator to Decide
              Arbitrability. .................................................................... 15

         C.     Patel's Claims are Subject to Arbitration. ......................... 17

    II.    FanDuel Is Entitled to Arbitration Based on Patel's Contracts
         with Betfair. .............................................................................. 20

         A.     By Clicking "I Agree," Patel Formed Arbitration
              Agreements with Betfair. .................................................. 21

         B.     Patel Is Estopped from Avoiding Arbitration Under these
              Agreements. .................................................................... 22

         C.     The Arbitrator Should Decide Arbitrability under the
              Sportsbook Contracts, but Regardless, Patel's Claims are
              Subject to Arbitration......................................................... 23

III.    The Court Should Stay All Proceedings Pending Resolution of
         the Arbitration. ............................................................................................ 24

CONCLUSION ............................................................................................................. 25

WORD COUNT CERTIFICATION .......................................................................... 27

CERTIFICATE OF SERVICE ................................................................................... 28

# TABLE OF AUTHORITIES

## CASES

*Arthur Andersen LLP v. Carlisle*
    556 U.S. 624 (2009) ................................................................................................. 22

*AT & T Mobility LLC v. Concepcion*
    563 U.S. 333 (2011) ................................................................................................... 6

*Blue Water Bay at Ctr. Hill, LLC v. Hasty*
    No. M2016-2382-COA-R3-CV, 2017 WL 5665410 (Tenn. Ct. App. 2017) ........................... 22

*Brooks v. WarnerMedia Direct, LLC*
    No. 23-CV-11030, 2024 WL 3330305 (S.D.N.Y. July 8, 2024) ............................................. 14

*Carson v. Home Depot, Inc.*
    No. 21-CV-4715, 2022 WL 2954327 (N.D. Ga. July 26, 2022) ............................................. 23

*Contec Corp. v. Remote Sol., Co.*
    398 F.3d 205 (2d Cir. 2005) ................................................................................................. 17

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*
    6 F. 4th 308 (2d Cir. 2021) ............................................................................... 15, 16, 17

*Doctor's Assocs. v. Alemayehu*
    934 F.3d 245 (2d Cir. 2019) ................................................................................................... 6

*Edmundson v. Klarna, Inc.*
    85 F. 4th 695 (2d Cir. 2023) ...................................................................................... passim

*First Options of Chi., Inc. v. Kaplan*
    514 U.S. 938 (1995) ................................................................................................. 6, 15

*Graham v. Bloomberg L.P.*
    No. 22-CV-7015, 2023 WL 6037974 (S.D.N.Y. Sept. 15, 2023) ........................... 7, 11, 12, 13

*Granite Rock Co. v. Int'l Bhd. of Teamsters*
    561 U.S. 287 (2010) ............................................................................................ 6, 18, 20

*Guan v. Uber Techs., Inc.*
    236 F. Supp. 3d 711 (E.D.N.Y. 2017) ................................................................................... 15

*Harrison v. Gen. Motors LLC*
    651 F. Supp. 3d 878 (E.D. Mich. 2023) ................................................................................ 22

*Hemphill v. Ford Motor Co.*
    206 P.3d 1 (Kans. Ct. App. 2009) ................................................................................. 22, 23

*Hu v. Whaleco, Inc.*
  No. 23-CV-6962, 2024 WL 4481439 (E.D.N.Y. Oct. 1, 2024)................................................. 9

*In re Am. Exp. Fin. Advisors Sec. Litig.*
  672 F.3d 113 (2d Cir. 2011)................................................................................................ 6

*In re Daily Fantasy Sports Litig.*
  No. 16-2677, 2019 WL 6337762 (D. Mass. Nov. 27, 2019) ........................................... 7, 9, 11

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*
  709 F. Supp. 3d 454 (M.D. Tenn. 2023).............................................................................. 22

*Kaiser v. StubHub, Inc.*
  No. 24-CV-44, 2024 WL 3445059 (S.D.N.Y. July 17, 2024)................................................ 19

*King v. Stage 29 Prods., LLC*
  No. 19-CV-9549, 2020 WL 3577925 (S.D.N.Y. July 1, 2020)............................................... 17

*Kwik Ticket Inc. ex rel. Shamah v. Spiewak*
  No. 20-CV-1201, 2022 WL 3446316 (E.D.N.Y. Aug. 17, 2022)........................................... 25

*Lloyd v. J.P. Morgan Chase & Co.*
  791 F.3d 265 (2d Cir. 2015)............................................................................................... 20

*Local Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*
  67 F. 4th 107 (2d Cir. 2023) .............................................................................................. 17

*Louis Berger Grp. v. State Bank of India*
  802 F. Supp. 2d 482 (S.D.N.Y. 2011).................................................................................. 25

*Meyer v. Uber Techs., Inc.*
  868 F.3d 66 (2d Cir. 2017)............................................................................................ passim

*Motorola Credit Corp. v. Uzan*
  388 F.3d 39 (2d Cir. 2004)................................................................................................. 7

*NASDAQ OMX Grp. v. UBS Secs., LLC*
  770 F.3d 1010 (2d Cir. 2014)............................................................................................. 17

*Nicosia v. Amazon.com, Inc.*
  834 F.3d 220 (2d Cir. 2016)............................................................................................... 8

*NRW, Inc. v. Bindra*
  No. 12-CV-8555, 2014 WL 4449779 (S.D.N.Y. Sept. 10, 2014)........................................... 7

*Palmer v. Starbucks Corp.*
  735 F. Supp. 3d 407 (S.D.N.Y. 2024).................................................................................. 16

*Plazza v. Airbnb, Inc.*
   289 F. Supp. 3d 537 (S.D.N.Y. 2018).................................................................... 14

*Sadlock v. Walt Disney Co.*
   No. 22-CV-9155, 2023 WL 4869245 (N.D. Cal. July 31, 2023)........................... 15

*Schnabel v. Trilegiant Corp.*
   697 F.3d 110 (2012)............................................................................................. 15

*Smith v. Spizzirri*
   601 U.S. 472 (2024)............................................................................................. 24

*Soliman v. Subway Franchisee Advert. Tr., Ltd.*
   999 F.3d 828 (2d Cir. 2021)................................................................................... 8

*Starke v. SquareTrade, Inc.*
   913 F.3d 279 (2d Cir. 2019)............................................................................. 7, 14

*Starkey v. G Adventures, Inc.*
   796 F.3d 193 (2d Cir. 2015)................................................................................. 14

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*
   464 F. Supp. 3d 634 (S.D.N.Y. 2020)................................................................... 21

*WorldCrisa Corp. v. Armstrong*
   129 F.3d 71 (2d Cir. 1997)................................................................................... 25

*Yost v. Everyrealm, Inc.*
   No. 22-CV-6549, 2023 WL 2859160 (S.D.N.Y. Apr. 10, 2023) .......................... 25

**STATUTES**

9 U.S.C. § 2............................................................................................................... 6

9 U.S.C. § 4............................................................................................................... 6

When Amit Patel signed up with FanDuel, Inc. to compete in fantasy sports contests, he agreed to FanDuel's Terms of Use, including an arbitration agreement. Patel then embezzled more than $20 million from his employer and spent the stolen funds on, among other things, a Tesla, private jets, a country club membership, and FanDuel's contests. After pleading guilty of wire fraud, Patel sued FanDuel and three other Defendants, looking to put the blame on them for the consequences of his own criminal choices. With nothing but time in federal prison to dream up unsupported conspiracy theories, Patel has now filed an Amended Complaint premised largely on the wild and unsubstantiated assertion that FanDuel knew that Patel was stealing from his employer. Even if these outlandish claims were true, Patel is nevertheless not entitled to sue FanDuel in this Court at all. Patel agreed in his FanDuel contracts to "binding arbitration as the sole means to resolve claims" "arising out of or relating to" the performance of the contracts, his use of Daily Fantasy Sports, or his "relationship with" FanDuel—squarely covering the claims raised in his Amended Complaint. If that were not enough to demonstrate that this matter belongs in arbitration, Patel entered two additional arbitration agreements with a corporate affiliate of FanDuel that FanDuel is also entitled to enforce. These arbitration agreements match the types of provisions that this Court and the Second Circuit have historically enforced, and another federal district court has previously concluded that FanDuel's arbitration provision is enforceable against its customers. This Court should do the same and hold Patel to these contracts, compel arbitration, and stay this case under Sections 3 and 4 of the Federal Arbitration Act.

## BACKGROUND

### I.    The Amended Complaint

In 2019, Amit Patel alleges that he started using money he stole from his employer, the Jacksonville Jaguars, to compete in FanDuel's Daily Fantasy Sports ("DFS") contests, among other things. *See* Am. Compl. ¶¶ 4, 54, 68, 91. As Patel describes it, DFS "is an online game

1

where gamblers choose a team of real-life athletes and compete against other gamblers in a single day contest." *Id*. ¶ 75.

Patel asserts that from 2019 to 2023, the "FanDuel knew" he was a gambling addict yet "enticed" him to "continue to deposit and gamble." *Id*. ¶¶ 35, 130. FanDuel allegedly gave him "financial incentives, lavish trips, event tickets, and other gifts" and assigned him a VIP host who Patel says was responsible for maximizing the money he spent. *Id*. ¶¶ 9, 39, 127. Patel also claims that FanDuel allowed other players to collude against him and circumvented regulatory requirements and its own internal policies. *Id*. ¶¶ 74, 86.

After Patel was convicted of federal crimes for his conduct, he brought this diversity action seeking $250,000,000 in compensatory and punitive damages. *See id*. ¶¶ 3, 266, 268, 277. He claims that FanDuel acted negligently, violated the Florida Deceptive and Unfair Trade Practices Act, conspired against him, and intentionally inflicted him with emotional distress. *Id*. ¶¶ 241–252, 253–262, 263–269, 270–277.

The original pleading brought claims against FanDuel and three other Defendants, alleging that they all engaged in essentially the same, undifferentiated conduct. *See* Compl. Patel voluntarily dismissed two of those Defendants. Dkt. 19, 20. FanDuel moved to compel arbitration, and FanDuel and its corporate affiliate, Flutter Entertainment PLC, moved to dismiss. Dkt. 29, 31. On February 18, 2025, Patel filed an amended complaint dropping his claims against Flutter. Dkt. 36.

## II.    Patel's Arbitration Agreements

Patel first signed up with FanDuel to play DFS on March 14, 2014. Decl. of Ron Salabit ¶ 4. Visitors to FanDuel's site that day arrived on a landing page with a bright orange "Join Now" button. *See* Decl. of Jason Bell (Dec. 16, 2024) ("Decl. of Jason Bell") Ex. A; Decl. of Ron Salabit ¶¶ 4, 6. As shown below, when a user clicked "Join Now," a box appeared asking for his name

and email and prompting him to pick a username and password.  *See* Decl. of Jason Bell Ex. B; Decl. of Ron Salabit ¶ 6.  The user was first warned, in text located underneath the "Play Now" button, "By signing up, you confirm that you are at least 18 years of age and agree to the **Terms of Use**."[1]  Decl. of Jason Bell Ex. B.  When a user then clicked "Play Now" to continue the sign-up process, he agreed to the Terms of Use.



Clicking on "**Terms of Use**" took every player in March 2014 to a separate page containing the agreement between FanDuel and the player. In all capital letters and big bold font at the top of the page was a notice that the agreement was subject to a binding arbitration clause in Section 15. *Id*. Ex. C; Decl. of Ron Salabit ¶ 7.  Patel could not have played DFS on FanDuel's platform in 2014 without having agreed to this section.

Section 15, titled "Binding Arbitration and Class Action Waiver," provided that "either party may initiate binding arbitration as the sole means to resolve" "all claims arising out of or

---

[1] A prospective user could access a similar sign-up screen by following a link located on a page where registered users could log in.  Attached are screenshots of that sign-up page from January 22 and July 3, 2014.  These screenshots include computer code that would not have been visible to a user at the time.  *See* Decl. of Jason Bell Ex. D; *id*. Ex. E; Decl. of Ron Salabit ¶¶ 4, 6.

relating to this Agreement (including its formation, performance and breach), the parties' relationship with each other and/or [the player's] use of the Site." Decl. of Jason Bell (Jan. 16, 2025) Ex. F, at 6. The only exceptions were for "relief in a small claims court" or "an action in state or federal court to protect [a party's] intellectual property rights." *Id*. Ex. F, at 7. FanDuel was permitted to make changes to the arbitration agreement with 60-days' notice. *Id*. In addition, a user was allowed to opt-out of the arbitration provision within 30 days of first using the site. *Id*. Patel did not. Decl. of Ron Salabit ¶ 9.

In October 2020, FanDuel updated its Terms of Use. *Id*. ¶ 10. Two months later, all active users were sent an email notifying them of the change. *Id*. Patel was an active user at that time. *Id*. That email warned that "FanDuel recently updated our Terms of Use" and asked them to "[p]lease take a moment to review them here at https://www.fanduel.com/terms." *Id*. Ex. A. Those Terms include a similar arbitration clause as the March 2014 agreement. *See id*. Ex. B, at 15–18. The October 2020 Terms also allow the parties to seek a judicial declaration regarding whether a party's claims were time-barred or could be brought in small claims court. *Id*. Ex. B, at 18. Patel entered FanDuel's contests until January 22, 2023, and the October 2020 Terms were in effect when Patel last used the service. *Id*. ¶ 11. Thus, for all periods of time Patel used FanDuel's site, he was on notice of, assented to, and was subject to a binding arbitration clause.

In 2022, Patel traveled to Kansas and Tennessee, where he wagered on FanDuel Sportsbook, a sports betting service operated by Betfair Interactive US LLC. *Id*. ¶¶ 13–14. Like FanDuel, Betfair is a subsidiary of Flutter Entertainment. *Id*. ¶ 13. Each time any Sportsbook user logs into the service for the first time in a state, they must also agree to the Terms of Use. *Id*. ¶ 15. When Patel placed his bets in 2022, users in Tennessee, including Patel, were warned to "[p]lease agree to our Terms of Use governing play in Tennessee to use FanDuel Sportsbook," and

users in Kansas, including Patel, received the same warning about that State. *Id*. Ex. C; *id*. Ex. D; *id*. ¶ 15. To place bets, users then had to click a box next to the affirmation, "I agree to the Terms of Use and Privacy Policy." *Id*. Ex. C; *id*. Ex. D. The Terms were available through two blue hyperlinks. Patel was not able to bet in Tennessee or Kansas without agreeing to these terms.

The Sportsbook contracts that Patel accepted contain clauses that subject to arbitration "all claims arising out of or relating to these Terms (including their formation, performance and breach), the parties' relationship with each other, and/or [the user's] use of the Services (including the Site, the App, and any wagering transactions)." *Id*. Ex. E, at 37; *Id*. Ex. F, at 37. The exceptions from arbitration in those contracts track the October 2020 FanDuel agreement. *See id*. Ex. E, at 39; *id*. Ex. F, at 38–39. Both open with a bold warning that the agreement includes a binding arbitration provision, and both include opt-out provisions that Patel did not take advantage of. *See id*. Ex. E, at 1, 40; *id*. Ex. F, at 1, 39; *id*. ¶ 17.

## ARGUMENT

Patel entered four separate agreements that subject his speculative and unfounded claims against FanDuel to arbitration. First, Patel agreed to arbitrate his claims against FanDuel when he chose to play DFS after being warned that by signing up, he assented to arbitration. Second, an email from FanDuel notified users such as Patel that the Terms of Use had been updated, and it included a link to the Terms and a message requesting that users review them. Again, these Terms of Use contained an arbitration provision with an explanation at the top in all caps explaining that the agreement contained a binding arbitration provision. After that warning was sent to all active users, Patel entered more contests. Both of these contracts delegate all questions of arbitrability to the arbitrator, but even if this Court reached the scope of provisions, Patel's claims are subject to arbitration. Finally, Patel entered two arbitration agreements with Betfair to place sports bets, and because Patel alleges that FanDuel and Betfair engaged in concerted misconduct, he cannot

5

avoid the enforcement of those agreements, either. A stay of the action in favor of arbitration is accordingly required, and this Court should exercise its discretion to stay the case as to any non-arbitrable claims.

## I.      Patel's Agreements with FanDuel Require Arbitration of His Claims.

The Federal Arbitration Act "reflects 'a liberal federal policy favoring arbitration agreements.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (quoting *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011)). To that end, Section 2 of the statute makes written arbitration agreements "valid, irrevocable, and enforceable." 9 U.S.C. § 2. "A party aggrieved by the alleged . . . refusal of another to arbitrate" may move a district court under Section 4 to "direct[]" that "arbitration proceed." *Id*. § 4.

For a district court to order arbitration under the FAA, (A) the parties must "have entered into a valid agreement to arbitrate" and (B) "the dispute at issue" must "come[] within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). Both issues are controlled by state law. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Meyer*, 868 F.3d at 74. While the court must decide for itself whether the parties entered a valid agreement to arbitrate, the parties may "clearly and unmistakably" delegate to the arbitrator the question "whether the arbitration clause applies to a particular dispute." *Doctor's Assocs. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010)). In resolving these issues, this Court applies a standard like the one used for a summary judgment motion, considering "all relevant, admissible evidence submitted" and drawing "all reasonable inferences in favor of the non-moving party." *Edmundson v. Klarna, Inc.*, 85 F. 4th 695, 702 (2d Cir. 2023) (citation omitted).

Patel agreed to arbitrate with FanDuel when he signed up to play DFS and again when he continued playing after an updated version of the Terms was sent to all active users. Those

agreements leave all disputes about arbitrability to the arbitrator.  But whoever decides the scope

of arbitration, the dispute here falls within the heartland of the parties' agreements.

### A.    Patel and FanDuel Entered Binding Agreements to Arbitrate.

When Patel clicked "Join Now" on March 14, 2014, he formed a valid arbitration

agreement with FanDuel.  To be binding, "a contract requires a 'meeting of the minds' and 'a

manifestation of mutual assent.'"[2] *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019)

(citation omitted).   In the context of Internet contracts, a website user like Patel is bound to the

terms of an agreement if:

> (1) notice of [FanDuel's] terms (and thus the arbitration provision contained
> therein) was reasonably clear and conspicuous such that a reasonable internet or
> smartphone user would be on inquiry notice of them and
>
> (2) [Patel] objectively and unambiguously manifested assent to the terms.

*Edmundson*, 85 F. 4th at 705; accord *Meyer*, 868 F.3d at 76.  Both conditions are met here.

*First*, FanDuel offered clear and conspicuous notice of the Terms of Use. On the FanDuel

sign-up page, users like Patel were confronted with a warning directly under the sign-up button

that "By signing up, you confirm that you are at least 18 years of age and agree to the Terms of

Use."  Another court has concluded that an almost identical version of FanDuel's interface put

users on inquiry notice of an arbitration agreement, see *In re Daily Fantasy Sports Litig.*, No. 16-

2677, 2019 WL 6337762, at *9–*10 (D. Mass. Nov. 27, 2019), and the Second Circuit and this

Court recently have decided that materially similar sign-up interfaces do as well,  see, *e.g.*,

*Meyer*, 868 F.3d at 79, 81 (California law); *Graham v. Bloomberg L.P.*, No. 22-CV-7015, 2023

---

[2] "[T]he law of contract formation is the same in New York and Florida." *NRW, Inc. v. Bindra*,
No. 12-CV-8555, 2014 WL 4449779, at *5 (S.D.N.Y. Sept. 10, 2014) (Sullivan, J.); *Edmundson*,
85 F. 4th at 702–703 ("[T]raditional contract formation law does not vary meaningfully from
state to state.").  Regardless, the FanDuel agreements contain New York choice-of-law
provisions. *See* Decl. of Jason Bell (Jan. 16, 2025) Ex. F, at 7; Decl. of Ron Salabit Ex. B, at 18.

WL 6037974, at *1, *6 (S.D.N.Y. Sept. 15, 2023) (Broderick, J.) (New York law).  *Second*, by entering his information and clicking "Play Now," Patel manifested assent to the agreement. Patel was again put on notice of and assented to the arbitration agreement when he continued playing DFS after FanDuel emailed all active users a second Terms of Use in December 2020.

       1.    FanDuel's conspicuous warning, "By signing up, you . . . agree to the Terms of Use," put a reasonable user on notice of the agreement.

A reasonable user of FanDuel's DFS website was on inquiry notice of the arbitration agreement because a warning about the Terms of Use was clearly and conspicuously presented on the sign-up page. The "clarity and conspicuousness" of arbitration terms on a website "are a function of the design and content of the relevant interface."  *Meyer*, 868 F.3d at 75.  Several design features can make notice "reasonably conspicuous" in the "totality of the circumstances." *Edmundson*, 85 F. 4th at 707 (citation omitted).  These include an "uncluttered" interface, a warning that a user should read the terms and that signing up would signal assent to the terms, a warning that is immediately visible and stands out on the screen, and a warning near the sign-up button that is presented to the user at the moment of sign-up.  *See Meyer*, 868 F.3d at 78–79; *Edmundson*, 85 F. 4th at 704, 706–707.  FanDuel designed its interface with *all* those features and thereby made the Terms of Use unmistakable to a reasonable user of the website.

*First*, the sign-up page is streamlined so that the user's eye cannot miss the warning that "[b]y signing up, you . . . agree to the Terms of Use."  The interface is "uncluttered, with only fields for the user to enter" personal information, a "button[] to register," a link to enter a promo code or referral username or to sign in, and the warning.  *Meyer*, 868 F.3d at 78; *see Edmundson*, 85 F. 4th at 704; *cf. Soliman v. Subway Franchisee Advert. Tr., Ltd.*, 999 F.3d 828, 836 (2d Cir. 2021) (concluding that notice was not provided where a warning was "dwarfed by the surrounding colorful text and imagery"); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016)

(holding that reasonable minds could disagree about notice where the interface contained "between fifteen and twenty-five links," and "various text [was] displayed in at least four font sizes and six colors . . . alongside multiple buttons and promotional advertisements"). By including only the information a player would need to effectively sign up for DFS, FanDuel's interface ensured that the warning would be brought to a reasonable user's attention.

*Second*, the DFS warning alerted the user to read the agreement before joining. The phrase "By signing up, you . . . agree" serves as "a clear prompt directing users to read the [agreement] and signaling that their acceptance of the benefit of registration would be subject to contextual terms." *Meyer*, 868 F.3d at 79 ("By creating an Uber account, you agree" (alteration omitted)).

*Third*, the design of the page made the Terms of Use readily apparent to a reasonable user. As soon as the page loads, the warning is front and center. *See id.* at 78. The hyperlink to the Terms of Use is in bold, charcoal text that stands out from the rest of the warning and the white background. *See id.*; *Daily Fantasy Sports*, 2019 WL 6337762, at *9–*10; *Hu v. Whaleco, Inc.*, No. 23-CV-6962, 2024 WL 4481439, at *12–*13 (E.D.N.Y. Oct. 1, 2024) (bolded hyperlinks). And the warning is in a grey color that parallels another important requirement for signing up: the user's password must be "min. 8 characters."

*Finally*, the warning and hyperlink to the Terms of Use are located directly below the sign-up button and the promo code link. A reasonable user "could not avoid noticing the hyperlink to [FanDuel's] terms when the user" clicks the button. *Edmundson*, 85 F. 4th at 695. And because notice "is provided simultaneously to enrollment," a reasonable user would also "understand that the terms were connected to the creation of a user account." *Meyer*, 868 F.3d at 78.

The Second Circuit has held that interfaces like FanDuel's give notice to a reasonable user. For example, in *Meyer v. Uber Technologies, Inc.*, the court approved an interface that required

the user to "click a button marked 'Register,' underneath which the screen state[d] "By creating

an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY."  868 F.3d at

76.  The screen was "uncluttered," the warning was close to the registration button, and the warning

directed users to read the terms and told them that registering would signal assent.  *Id*. at 78–79.

Although that warning was "in a small font," the "dark print contrast[ed] with the bright white

background," and the hyperlinks stood out from the text.  *Id*. at 79.

      As these images show, FanDuel used a design parallel to the one found effective in *Meyer*:



The language, placement, and design of the warnings are in every relevant respect materially

similar.  If anything, FanDuel's interface presents the warning and the hyperlink to the Terms of

Use in a more intuitive and striking way than Uber's interface did in *Meyer*.  Less text and space

separate the warning and hyperlink from the button that registers the user.  Fewer graphics and

logos draw the eye away from them.  And unlike the Uber interface, where a user could click to

add a promo code, to scan a credit card, to "Register," to use "PayPal," to use "Google Wallet," or

finally, to access the terms and privacy policy, on FanDuel's site, the user only clicks to get the

terms, to "Play Now," to enter a promo code or referral username, to log in, or to leave the page.

Following *Meyer*, the Second Circuit has held that other interfaces like Uber's and FanDuel's gave inquiry notice. Consider the interface in *Edmundson v. Klarna, Inc.*:



The Court held that a reasonable user was effectively put on notice that the underlined "payment terms," visible as they were on the page, "were connected to finalizing a purchase." 85 F. 4th at 707. The same is true of FanDuel's page, which used bold text to spotlight the Terms of Use link.

Applying Second Circuit authority, another district court recently held that a FanDuel interface nearly identical to the 2014 website gave inquiry notice to reasonable users. See *Daily Fantasy Sports*, 2019 WL 6337762, at *9–*10. The district court there explained that "[a]ny reasonable viewer considering whether to click the 'Play Now' button would necessarily notice" the warning, "including the bolded text," and "would recognize" the "bolded words '**Terms of Service**' within it . . . as a hyperlink to another document." *Id*. at *9. There is no reason to reach a different conclusion here.

This Court also recently compelled arbitration based on an interface with a warning far less

clear and conspicuous than FanDuel's. *See Graham*, 2023 WL 6037974, at *1, *6. That subscription page gave notice of an arbitration agreement even though Bloomberg's warning was much farther from the "Purchase" button and separated by more intervening text than FanDuel's warning is from the "Play Now" button. *Id*. at *1, *4. Bloomberg's warning, in similar language to FanDuel's, was "a clear prompt to read the terms and conditions and signals to a user that purchase will bind them to those terms." *Id*. at *5. Like FanDuel's interface, Bloomberg's presented links in different styles—some in all capitals, some not, some in white text, some in black. And just as Bloomberg's hyperlink was "underlined and in black text on a white background," "in a font size comparable to numerous other text items on [the] screen," *id*., FanDuel's was bolded, in charcoal text on a white background, and in a size comparable to the link for existing users to log in. There is no meaningful difference between the interface that gave inquiry notice in *Graham* and FanDuel's, and this Court should treat them the same.

Any distinctions between the FanDuel interface and those at issue in *Meyer*, *Edmundson*, *Daily Fantasy Sports*, and *Graham* are immaterial. Indeed, there is considerable variation among the interfaces in those cases, too. For a hyperlink, some use blue text (*Meyer*) or underlined text (*Edmundson*, *Graham*) or bold text (*Daily Fantasy Sports*). Some give a more concise warning (*Edmundson*) or a longer one (*Daily Fantasy Sports*), and some insert more intervening information between the warning and the button (*Graham*) than others (*Edmundson*). The Second Circuit never has adopted a magic template that alone can be used to put a user on notice. *See Edmundson*, 85 F. 4th at 707. What matters is whether notice of the terms was *reasonably* conspicuous in the totality of the circumstances. *See Meyer*, 868 F.3d at 76. Here, FanDuel's interface uses design principles recently endorsed by the Second Circuit, this Court, and other

district courts to give notice of the arbitration agreement a user must accept to create an account.[3]

> 2.    Patel manifested assent to the agreement by signing up to play.

When Patel clicked on the sign-up button, he unambiguously agreed to the Terms of Use, including the arbitration agreement.  A visitor to a website who "does not explicitly say 'I agree'" to the Terms of Use still assents if "a reasonably prudent user would understand his or her conduct to constitute assent." *Edmundson*, 85 F. 4th at 704.  Courts in this Circuit consider "whether the interface clearly warned the user that taking a specific action would constitute assent," whether notice "was presented to the consumer in a location on the interface and at [a] time when the consumer would expect to receive such terms," and the parties' "course of dealing." *Id*. at 704–705 (citation omitted).    On FanDuel's site, a reasonable user would understand that clicking the button signaled assent to the Terms of Use because, as explained above, the site warned that signing up required assent.  The Terms were presented close to the sign-up button and during the sign-up process, so "[a] reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink." *Meyer*, 868 F.3d at 79–80.  And Patel signed up "with the intention of entering into a forward-looking relationship with [FanDuel]"—paying entry fees to play fantasy sports contests where he might win prizes—"one that would require some terms and conditions." *Meyer*, 868 F.3d at 80; *see Edmundson*, 85 F. 4th at 708.  Considering these factors, users were on notice that clicking the button would bind them to the Terms, and Patel's choice to click on it manifested his assent. *See, e.g.*, *Graham*, 2023 WL 6037974, at *4 (collecting cases).

> 3.    In 2020, Patel was again put on notice of the arbitration agreement via

---

[3] The alternative sign-up screen is in all relevant respects almost identical to the one accessed on the homepage.  The text of the button says "Join Now" instead of "Play Now," there is a box where a prospective player could fill in a promo code or referral information, and there is line of text, smaller than the font of the warning, explaining that a user could enter "DEPOSITBONUS" to get the "best available offer." *See* Decl. of Jason Bell Ex. D, E.

email and manifested assent by continuing to play Daily Fantasy Sports.

Even if the 2014 sign-up page somehow failed to put Patel on inquiry notice, an email FanDuel sent in December 2020 notifying users about the October 2020 Terms did, and Patel assented to that new agreement by continuing to use the site. Because arbitration clauses that are broadly worded—like the one in the October 2020 terms—apply retroactively to any preexisting claims, the Court should compel arbitration under this second agreement as well. *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 551 (S.D.N.Y. 2018) (Broderick, J.).

The Terms of Use were conspicuously presented in the December 2020 email. As in the context of a website, an email sent after a transaction gives a reasonable user inquiry notice of an agreement if the terms "were provided to [the user] in a clear and conspicuous way." *Starke*, 913 F.3d at 292; *see Brooks v. WarnerMedia Direct, LLC*, No. 23-CV-11030, 2024 WL 3330305, at *11 (S.D.N.Y. July 8, 2024) (collecting cases applying California law). FanDuel's email meets that test. The subject line, "Terms of Use Update," alerted users that the message contained important information about the agreement governing DFS. Declaration of Ron Salabit ¶ 10. And the email itself concisely explained that FanDuel "recently updated [its] Terms of Use," warns the user to "[p]lease take a moment to review them at https://www.fanduel.com/terms," and signals that the url is a hyperlink by presenting it in underlined blue text. *Id*. Ex. A. Such a straightforward presentation of the updated terms would have let any reasonable FanDuel contestant know that her continued use of DFS would be subject to the Terms of Use available at the hyperlink. *See Plazza*, 289 F. Supp. 3d at 550 (emails were "yet another form of notice" because they referenced updates to Terms of Service in the subject line, told users in the body that the Terms were updated, and gave a link); *cf. Starkey v. G Adventures, Inc.*, 796 F.3d 193, 197 (2d Cir. 2015) (emails "sufficiently directed" attention to terms, for purposes of reasonably communicating a forum selection clause, "by means of a hyperlink and language advising [her] to click on the hyperlink");

14

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 & n.14 (2012) (unsolicited email with terms buried after description of membership benefits did not give notice).

After the updated terms were sent to all active users in December 2020, Patel agreed to them when he continued to play DFS. The first page of the conspicuously hyperlinked terms clearly warned Patel that if he used FanDuel's services, he assented to the terms.  *See* Decl. of Ron Salabit Ex. B, at 1.  Because Patel played DFS for *years* after December 2020, he manifested his assent. *See, e.g.*, *Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 726 (E.D.N.Y. 2017); *Sadlock v. Walt Disney Co.*, No. 22-CV-9155, 2023 WL 4869245, at *11–*12 (N.D. Cal. July 31, 2023) (collecting cases under California law that hold "emails followed by continued use is sufficient to establish assent" and applying that rule even where the sign-up page did not initially give notice).

For those reasons, arbitration is required under the FAA regardless of whether the March 2014 sign-up page put Patel on inquiry notice of the agreement.  In any event, because the December 2020 email also gave Patel notice, the October 2020 terms control this dispute.

## B.    These Agreements Require the Arbitrator to Decide Arbitrability.

The Court need not decide anything further to compel arbitration under the FAA because the March 2014 and October 2020 terms require that the arbitrator decide if Patel's claims fall within the scope of the agreement.  Disputes about arbitrability should be referred to the arbitrator if there is "clear and unmistakable evidence" that the parties agreed to do so. *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F. 4th 308, 317 (2d Cir. 2021) (quoting *First Options*, 514 U.S. at 944 (alterations omitted)).  Arbitrability is unmistakably delegated to the arbitrator "where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes," and where it incorporates "rules that expressly empower an arbitrator to decide issues of arbitrability." *Id.* at 318–319.   The FanDuel terms meet this standard. And because the dispute here is not even "arguably exclude[d]" from the scope of the agreement by any exceptions in the terms, *id.* at 322,

any arbitrability issues are properly decided by the arbitrator, not this Court.

Both the March 2014 and October 2020 terms are broad and contain express delegation clauses that send all disputes to the arbitrator, including disputes about the scope of arbitration. Under the March 2014 terms, "all claims arising out of or relating to this Agreement" are subject to arbitration and the terms delegate all disputes about the Agreement to the arbitrator:

> The arbitrator . . . shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement, including, but not limited to . . . whether a claim is subject to arbitration.

*See* Decl. of Jason Bell (Jan. 16, 2025) Ex. F, at 6–7.  The October 2020 terms also require arbitration of "all claims arising out of or relating to these Terms" and contain a delegation clause:

> Except as set forth in Section 15.5, the arbitrator . . . shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including, but not limited to . . . whether a claim is subject to arbitration.

See Decl. of Ron Salabit Ex. B, at 16.  Numerous courts faced with similarly explicit statements that arbitrability is for the arbitrator have found that indeed, the parties did clearly intend the arbitrator to resolve arbitrability.  *See, e.g.*, *Palmer v. Starbucks Corp.*, 735 F. Supp. 3d 407, 419 (S.D.N.Y. 2024).

On top of those delegation clauses, both agreements entered into by Patel and FanDuel incorporate rules that empower an arbitrator to decide arbitrability.  The March 2014 terms state that arbitration shall be "administered by the American Arbitration Association [AAA] in accordance with the provisions of its Commercial Arbitration Rules and the supplementary procedures for consumer related disputes."  Decl. of Jason Bell (Jan. 16, 2025) Ex. F, at 6.  And the AAA Commercial Arbitration Rules "explicitly empower an arbitrator to resolve questions of arbitrability."  *DDK Hotels*, 6 F. 4th at 318.  The October 2020 terms provide that arbitration shall be "administered by JAMS in accordance with the provisions of its Streamlined Arbitration and

Procedures." Decl. of Ron Salabit Ex. B, at 16. Those rules also delegate to the arbitrator the responsibility of deciding arbitrability. *King v. Stage 29 Prods., LLC*, No. 19-CV-9549, 2020 WL 3577925, at *4 (S.D.N.Y. July 1, 2020). Along with the delegation clauses, the incorporation of these rules shows that the parties intended to delegate arbitrability to the arbitrator. *See Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *DDK Hotels*, 6 F. 4th at 321 n.4.

Finally, it is immaterial that the agreements include exceptions for intellectual property and small claims court claims. Those exceptions do not apply here. Patel's claims that FanDuel enticed him to play DFS have nothing to do with intellectual property rights, and his attempt to obtain $250,000,000 in damages is not remotely suited to small claims court. Neither exception even "*arguably* covers the present dispute," and thus the parties unambiguously chose arbitration as the venue to resolve the arbitrability of this case. *NASDAQ OMX Grp. v. UBS Secs., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) (emphasis added).

### C.    Patel's Claims are Subject to Arbitration.

The Court should compel arbitration and leave to the arbitrator the question whether Patel's claims are subject to arbitration. But were this Court to decide the issue, Patel's claims that FanDuel unlawfully enticed him to play DFS fit comfortably within the scope of the arbitration contracts. A court should compel arbitration when "a particular dispute" is, under "ordinary principles of contract law," unambiguously "covered by the language to which the parties agreed."[4] *Local Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F. 4th 107, 114 (2d Cir. 2023) (per curiam). If the "agreement is 'ambiguous about whether it covers the dispute,'" a "'presumption of arbitrability'" applies. *Id.* (quoting *Granite*

---

[4] New York supplies those principles because both agreements include enforceable New York choice-of-law clauses. *See* Decl. of Jason Bell Ex. F, at 7; Decl. of Ron Salabit Ex. B, at 17.

*Rock*, 561 U.S. at 301). Here, the plain language of the agreements easily encompasses Patel's claims, but even if it did not, the Court should resolve any ambiguity in favor of arbitration.

Patel's allegations boil down to a claim that in one way or another, FanDuel engaged in misconduct by "enticing" him to participate in DFS and gamble. Am. Compl. ¶¶ 38, 238, 276. Those enticements allegedly included "financial incentives" that FanDuel gave to Patel in the form of FanDuel credits. *See, e.g.*, *id.* ¶¶ 39–52, 130–237. FanDuel also allegedly "circumvented" certain regulatory requirements and internal policies and allowed other players to "collude[]" against Patel "to keep [Patel] gambling on its site." *Id.* ¶¶ 74, 84, 86. And FanDuel allegedly "create[d]" and "nurture[d]" Patel's addiction by cultivating a "quasi-personal relationship" between him and a VIP host. *Id.* at 2, ¶¶ 9–14, 25, 128–129, 240, 260, 276. In short, the whole point of the Amended Complaint is that FanDuel, in the course of providing DFS contests to Patel, abused its relationship with him to increase his use of its services.

The October 2020 agreement unambiguously covers any disputes based on misconduct by FanDuel related to Patel's participation in DFS contests. As described above, that agreement subjects to arbitration "all claims arising out of or relating to [the] Terms (including their formation, performance and breach), the parties' relationship with each other and/or [Patel's] use of the Service." "Service" is defined as the "fantasy sports website located at fanduel.com," "the mobile app, and any other features, tools, materials, or other services (including co-branded or affiliated services) offered from time to time by FanDuel." Decl. of Ron Salabit Ex. B, at 1. This expansive language subjects to arbitration any dispute about FanDuel's provision of DFS contests to Patel. Consider what's covered by "all claims . . . relating to" the "performance" of the "Terms." To give only a few examples from the contract, any claims must be arbitrated relating to: (i) Patel's payment of "[e]ntry fees" for contests; (ii) FanDuel's award of "prizes"; (iii) FanDuel's "offer" of

"bonuses" and "credit[s]"; (iv) FanDuel's "eligibility requirements" and "responsible play policies"; (v) "commercial communications from FanDuel"; (vi) FanDuel's "checks for Terms compliance, including anti-fraud checks"; and (vii) Patel's "use" of FanDuel's "Service . . . in violation of any applicable law." *Id.* Ex. B, at 2–3, 5–6, 8–10. Patel's allegations correspond exactly with this course of performance. *See, e.g.*, Am. Compl. ¶ 36 ("communication between FanDuel and [Patel]"); ¶ 78 (entry fees); ¶¶ 130–237 (credits); ¶¶ 74, 239, 248, 274 (regulatory requirements, internal policies, and guidelines).

But the arbitration agreement is much broader still. It also encompasses claims "relating to" Patel's "relationship with" FanDuel, which Patel characterizes in the Amended Complaint as one of "enticement." *See, e.g.*, *id.* ¶¶ 39–41. It encompasses claims "relating to" Patel's "use of" "services . . . offered . . . by FanDuel," Decl. of Ron Salabit Ex. B, at 1, 16, including the VIP host. And to top it all off, it encompasses claims "relating to" Patel's "use of" the DFS site. Courts have said arbitration clauses that "refer[] to claims 'arising out of relating to' an agreement" are "the paradigm of a broad clause." *Kaiser v. StubHub, Inc.*, No. 24-CV-44, 2024 WL 3445059, at *4 (S.D.N.Y. July 17, 2024) (citation omitted). FanDuel's arbitration clause makes even clearer that arbitration is the venue to resolve any wrongdoing associated with its provision of DFS.

For essentially the same reasons, the March 2014 Terms of Use also unambiguously cover the claims raised in the Amended Complaint. That agreement provides for arbitration of "all claims arising out of or relating to [the] Agreement (including its formation, performance and breach), the parties' relationship with each other and/or [Patel's] use of the Site," defined as "[t]he web pages available at www.FanDuel.com, and all linked pages." Decl. of Jason Bell (Jan. 16, 2025) Ex. F, at 1, 6. It also lays out FanDuel's and Patel's obligations about "[e]ntry fees," "prizes," "bonuses," "eligibility requirements," "commercial communications from FanDuel," and

Patel's "use" of the site "in violation of any applicable law." *Id*. Ex. F, at 1–4. So, the course of performance described here, much like the one in the October 2020 contract, matches up with Patel's claim that FanDuel, knowing he had a gambling addiction, enticed him with incentives and communications from a VIP host to pay entry fees in the hope of winning prizes. What's more, like the October 2020 agreement, the earlier contract encompasses claims "relating to" the parties' relationship, and it encompasses claims "relating to" Patel's use of the DFS website. *Id*. Ex. F, at 6. As with the later agreement, the 2014 clause is easily construed to cover the dispute raised in the Amended Complaint.

These agreements are not at all ambiguous, but even assuming they were, this Court should presume that the arbitration clauses cover Patel's claims. The presumption of arbitrability ensures the parties' intent to arbitrate is honored where an arbitration clause is "best construed to encompass the dispute." *Granite Rock*, 561 U.S. at 303. So "if an agreement is truly ambiguous," the presumption can "tip the scale" in favor of arbitration. *Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 270 (2d Cir. 2015). Here, Patel agreed to broad arbitration clauses that reflect an intent to comprehensively direct to the arbitrator all claims about FanDuel's or Patel's misconduct related to DFS—which is what Patel's claims in this case are about. Because the parties clearly intended to arbitrate claims like Patel's, any possible ambiguity about the scope of the arbitration clauses here should thus be best construed as favoring arbitration.

## II.    FanDuel Is Entitled to Arbitration Based on Patel's Contracts with Betfair.

In addition to entering DFS contests, Patel placed bets on a platform called the FanDuel Sportsbook, which is operated by FanDuel's corporate affiliate Betfair. When Patel wagered on the Sportsbook in Kansas and Tennessee, he formed arbitration agreements with Betfair. And because Patel alleges concerted wrongdoing by FanDuel and Betfair, he is now estopped from avoiding arbitration of those disputes with FanDuel.

### A.    By Clicking "I Agree," Patel Formed Arbitration Agreements with Betfair.

Like the FanDuel interface, the Sportsbook interface gave Patel more than adequate notice of the arbitration provisions, and he assented by clicking a box that registered his agreement. Contracts like these that present the user "with 'a message on his or her computer screen'" and that require her "to manifest her assent to the terms" are "routinely enforce[d]" by the Second Circuit. *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (alterations and citations omitted).  For such an agreement to be enforceable, the user must be "required to indicate her assent," and the terms must be "'reasonably conspicuous.'"  *Id.* (quoting *Meyer*, 868 F.3d at 76).  The Sportsbook interface hits that mark.  Patel was required to manifest assent by clicking a box.  And applying the notice principles outlined above, see Section I.A.1, the Terms of Use were clearly presented on the interface.

The Sportsbook interface gave Patel multiple warnings about the Terms of Use.



A reasonable user could not avoid seeing the warning with a hyperlink to the Terms, the box to

"agree to the Terms of Use," and *another* hyperlink to the Terms. Courts have held similar interfaces provided inquiry notice that *did not* require a user to affirmatively click a box signaling assent. *See Edmundson*, 85 F. 4th at 707. Here, because the user had to actively click to "agree to the [hyperlinked] Terms of Use," notice of the Terms was even more conspicuous.

### B.    Patel Is Estopped from Avoiding Arbitration Under these Agreements.

Because Patel alleges that FanDuel and Betfair engaged in concerted misconduct, he cannot avoid arbitration under the Betfair contracts. "[T]raditional principles of state law" allow an arbitration agreement "to be enforced by or against nonparties to the contract." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (citation omitted). Relevant here, Kansas and Tennessee recognize that a signatory to an arbitration agreement can be "estopped . . . from opposing arbitration" with a nonsignatory. *Hemphill v. Ford Motor Co.*, 206 P.3d 1, 9 (Kans. Ct. App. 2009); *Blue Water Bay at Ctr. Hill, LLC v. Hasty*, No. M2016-2382-COA-R3-CV, 2017 WL 5665410, at *9–*14 (Tenn. Ct. App. 2017). In Kansas, a signatory is estopped if she alleges "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Hemphill*, 206 P.3d at 9 (citation omitted). Some courts applying Tennessee law have adopted this approach, too. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 454, 466 (M.D. Tenn. 2023). *But see Harrison v. Gen. Motors LLC*, 651 F. Supp. 3d 878, 891 (E.D. Mich. 2023) (finding no Tennessee cases recognizing this theory).

Patel alleges that FanDuel enticed him to gamble in violation of policies it adopted as an operator of Betfair's Sportsbook platform. Patel describes FanDuel as a participant in Betfair's Sportsbook operations, alleging that FanDuel "offers sportsbook" and is one of the "largest providers of . . . sports betting" in the country. Am. Compl. ¶¶ 17, 19. And he claims that in its capacity as a Sportsbook operator, FanDuel allegedly adopted certain policies that it then violated by knowingly enticing him to gamble on NFL games. Specifically, Patel alleges that "[a]s an

Official Sports Betting Partner of the National Football League, FanDuel agreed to adhere to the [NFL's] core integrity policies, and agreed to collaborate with the [NFL] on intelligence sharing, advocacy efforts, and responsible gaming education." *Id.* ¶ 7. The next paragraph alleges that the "FanDuel knew that [Patel] was employed by the Jacksonville Jaguars." *Id.* ¶ 8. Whether FanDuel found out about Patel's employment through the NFL, as those paragraphs imply, or through the VIP host, as the Amended Complaint later alleges, see *id.* ¶ 37, FanDuel allegedly knew that Patel "was not permitted to gamble on the [NFL]," *id.*, but enticed him to do so anyway, see *id.* ¶ 38. These allegations form part of the factual basis for Patel's claims that "[t]here was an agreement between two or more parties to circumvent its own Program . . . and guidelines"— fairly read in the context of the Amended Complaint to include the NFL's "core integrity policies" and other rules preventing Patel from betting on the NFL—"to ensure [Patel] . . . continue[d] depositing money to gamble." *Id.* ¶ 274; *see id.* ¶¶ 74, 248. And because it is Betfair that *actually* runs the Sportsbook, not FanDuel, see Decl. of Ron Salabit ¶ 14, Patel in effect alleges that FanDuel and Betfair engaged in "substantially interdependent and concerted misconduct" by jointly running the Sportsbook, collaborating with the NFL as an Official Sports Betting Partner, agreeing to the NFL's policies, and yet enticing Patel to gamble on the NFL. *Hemphill*, 206 P.3d at 9 (citation omitted). In other words, Patel "cannot avoid the [Sportsbook] arbitration clause" "by tactically omitting the signatory, [Betfair], from this case and then summarily attributing its acts and omissions to a nonsignatory defendant, [FanDuel]." *Carson v. Home Depot, Inc.*, No. 21-CV-4715, 2022 WL 2954327, at *4 (N.D. Ga. July 26, 2022).

### C.    The Arbitrator Should Decide Arbitrability under the Sportsbook Contracts, but Regardless, Patel's Claims are Subject to Arbitration.

This Court should compel arbitration based on the Sportsbook contracts without reaching any arbitrability issues. Because the arbitration clauses, exceptions, delegation clauses, and JAMS

rules in the Sportsbook contracts are in all relevant respects essentially the same as the October 2020 FanDuel contract, for the same reasons, the Sportsbook contracts clearly and unmistakably delegate all disputes about arbitrability to the arbitrator.  *See* Section I.B; Decl. of Ron Salabit Ex. E, at 37–39; *id*. Ex. F, at 37–39.  Regardless, the Sportsbook arbitration clauses encompass Patel's claims that FanDuel and Betfair engaged in concerted misconduct to entice Patel to gamble on a prohibited sport.  Like the FanDuel DFS arbitration clauses, the Sportsbook clauses extend to all claims relating to "the parties' relationship," Patel's "use of the Services," and the "performance and breach" of the Terms, which prohibit any "employee of a team" from betting on an event if "the wager is based on a sporting event overseen by the person's sports governing body."  Decl. of Ron Salabit Ex. F, at 6, 37, 43; *see id*. Ex. E, at 6, 37 (prohibiting any "employee … of a team" from "wagering on games within their leagues or sports in which they participate").  Because these clauses manifest the parties' intent to arbitrate all disputes concerning misconduct related to Sportsbook, including FanDuel's alleged enticement of Patel to continue gambling despite his prohibited status, they unambiguously cover Patel's claims and any ambiguity should be resolved in favor of arbitration.

### III.   The Court Should Stay All Proceedings Pending Resolution of the Arbitration.

The Court should stay all proceedings against FanDuel while arbitration occurs.  When "a dispute is subject to arbitration, and a party has requested a stay of the court proceedings pending arbitration," the FAA "compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 475, 478 (2024).  FanDuel has requested a stay and respectfully asks the Court to grant its request.

In the event the Court finds non-arbitrable any claims against FanDuel, the Court should exercise its discretion to stay the action as to those claims as well.  District courts have inherent power to stay a case to preserve judicial resources and avoid substantial prejudice to the parties, including the "expense and inconvenience" of litigation that might "adversely affect the outcome

of . . . arbitration." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997). In light of these interests, "[a] stay is usually appropriate where arbitrable and non-arbitrable claims arise out of the same set of facts and arbitration may decide the same facts at issue in the litigation." *Louis Berger Grp. v. State Bank of India*, 802 F. Supp. 2d 482, 489 (S.D.N.Y. 2011). Because most of the same alleged misconduct forms the basis for each claim, if the Court were to send only some claims against FanDuel to arbitration, there would be "issues common to the arbitration and the courts" that would "finally be determined by the arbitration." *Id*. (citation omitted). A stay would therefore "conserve resources," *Yost v. Everyrealm, Inc.*, No. 22-CV-6549, 2023 WL 2859160, at *12 (S.D.N.Y. Apr. 10, 2023) (collecting cases), and avoid parallel litigation that could "unfairly affect the arbitral proceedings or result in inconsistent outcomes," *Kwik Ticket Inc. ex rel. Shamah v. Spiewak*, No. 20-CV-1201, 2022 WL 3446316, at *6 (E.D.N.Y. Aug. 17, 2022). FanDuel is prepared to arbitrate this case in a reasonable time and manner and is unaware of any reason why a stay would "cause undue hardship" to Patel. *Louis Berger*, 802 F. Supp. 2d at 490 (citation omitted). To the contrary, failure to stay this entire action would undermine the reason why Patel and FanDuel agreed to arbitration in the first place—to avoid the expense and delay of needless litigation about misconduct relating to Daily Fantasy Sports.

## CONCLUSION

For those reasons, the Court should compel arbitration and stay this action.

Dated: February 21, 2025                     SUSMAN GODFREY L.L.P.

                                             By: */s/ Vineet Bhatia*
                                             _____

Vineet Bhatia (2419273)
vbhatia@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Stephen E. Morrissey (*pro hac vice*)
smorrissey@susmangodfrey.com
401 Union Street, Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Jason Bell (*pro hac vice*)
jbell@susmangodfrey.com
One Manhattan West
New York, New York 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

*Attorneys for FanDuel, Inc.*

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, I hereby certify that the total number of words in this memorandum, excluding the caption, table of contents, table of authorities, signature block, and certificate of service, and word count certification is 8,698.

*/s/ Vineet Bhatia*
Vineet Bhatia

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Vineet Bhatia*
Vineet Bhatia