**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMIT PATEL, | |
| Plaintiff, | Civil Action No.: 1:24-cv-07402-VSB |
| v. | |
| FAN DUEL, INC.; XYZ CORPS. 1-10; JANE AND JOHN DOES 1-10, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

---

**Plaintiff Amit Patel's Memorandum of Law in Opposition to Defendant FanDuel Inc.'s Motion to Compel Arbitration and Stay**

---

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………    3

INTRODUCTION……………………………………………………………………    4

SUMMARY OF AMENDED COMPLAINT…………………………………………..    4

LEGAL ARGUMENT……………………………………………………………….    6

      I.     Patel's Claims are Not Subject to the Binding Arbitration in Section 15.2…    6
            Because Application is Limited by the Plain Language of Section 15.1 and
            Terms of Use

      II.    Patel's Claims are Not Arbitrable Because the Parties Never Agreed to…..    8
            Arbitrate Issues of Fraud or Tort Involving FanDuel's VIP Program, VIP Hosts,
            and the Predatory Practices Outlined in the Amended Complaint

      III.   FanDuel's Interpretation Would Create an Unenforceable "Infinite………    11
            Arbitration Clause"

      IV.   The Declaration of Ron Salabit is Insufficient to Establish Notice………..    15

CONCLUSION………………………………………………………………………    16

WORD COUNT CERTIFICATION…………………………………………………    17

**TABLE OF AUTHORITIES**

AT&T Techs., Inc. v. Communications Workers of America, 475 U.S. 643 (1986)…. 9

Davitashvili v. GrubHub Inc., 2023 U.S. Dist. LEXIS 44780 (S.D.N.Y. Mar. 16, 2023)… 13

Gateway Coal Co. v. Mine Workers, 414 U.S. 368 (1974)………………………………….. 9

Gillman v. Chase Manhattan Bank, N.A., 537 N.Y.S.2d 280 (2012)……………………….. 14

Gingras v. Think Fin., Inc., 922 F.3d 112 (2d Cir. 2019)………………………………… 11

Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287 (2010)………………………8, 9, 10

Greenwich Capital Fin. Prods., Inc. v. Negrin, 903 N.Y.S. 2d 346 (1st Dep't 2010)…… 13

Hearn v. Comcast Cable Communications, LLC, 415 F.Supp. 3d 1155 (N.D. Ga. 2019)…12, 13

Leonard v. PepsiCo, Inc., 88 F.Supp. 2d 116 (S.D.N.Y. 1999)………………………… 9

Local Union 97, IBEW v. Niagara Mohawk Power Corp., 67 F.4th 107 (2d Cir. 2023)…8, 9, 10

McFarlane v. Altice USA, Inc., 524 F.Supp. 3d 264 (S.D.N.Y. 2021)………………….. 9, 11,14

N.Y. Knicks, LLC v. Maple Leaf Sports & Ent. Ltd., 2024 WL 3237563……………… 11
(S.D.N.Y. Jun. 28, 2024)

Nicosia v. Amazon.com, Inc., 834 F.3d 220 (2d Cir. 2016)……………………………….. 15

Ohio Sec. Ins. Co. v. Kinsale Ins. Co., 2024 U.S. Dist. LEXIS 229815………………… 15
(S.D.N.Y. Dec. 17, 2024)

Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152 (2d Cir. 2003)……………… 10

Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63 (2010)……………………………….... 11

Sanchez v. Clipper Realty, Inc., 2023 WL 7272062 (2d Cir. Nov. 3, 2023)…………….. 10

Smith v. Steinkamp, 318 F.3d 775 (7th Cir. 2003)………………………………………. 12

Starr Indem. & Liab. Co. v. Brightstar Corp., 388 F.Supp. 3d 304 (S.D.N.Y. 2019)……. 10

Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 16 N.Y.S. 3d 21 (2015)… 10

Wexler v. AT&T Corp., 211 F.Supp. 3d 500 (S.D.N.Y. 2016)…………………………… 9, 11

## INTRODUCTION

The Defendant FanDuel, Inc.'s ("FanDuel") decision to focus the opening paragraph of its brief on the demonization of a recovering gambling addict is a shamefully outdated approach, and wholly irrelevant to disposition of the instant motion. FanDuel's effort to reduce the Plaintiff Amit Patel's ("Plaintiff" or "Patel") Amended Complaint to a blame shifting scheme is a complete mischaracterization of the dispute underlying this case. Plaintiff is not blameless, and nowhere in the Amended Complaint does he claim to be. But while Patel is in prison paying for his transgressions, FanDuel asks the Court to wholly ignore their wrongdoing. To be clear, not only did FanDuel knowingly and actively participate in and aggressively grow Patel's addiction, they are the singular party to gain from the addiction's consequences; Patel is in prison and his former employer lost over $20,000,000 -- but FanDuel profited millions.

Gambling addiction is classified by both the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5-TR") and World Health Organization's International Classification of Diseases as an addictive disorder, alongside alcohol, opioid, hallucinogen, sedative, stimulant, and tobacco use disorders. FanDuel's decision to use its brief to sneer at the foreseeable consequences of this addiction is both disappointing and desperate, belying the asserted strength of their legal arguments.

## SUMMARY OF AMENDED COMPLAINT

The Plaintiff's Amended Complaint is incorporated by reference herein as if stated again at full length. In summary as set forth in the Amended Complaint's *Introduction*, the Plaintiff alleges Plaintiff gambled over $20 Million dollars with FanDuel on daily fantasy sports ("DFS") between late 2019 and early 2023. FanDuel actively participated in and grew the addiction of

Plaintiff beginning no later than July 19, 2021 when FanDuel first executed a custom clandestine enticement scheme providing Plaintiff with $60,000 in credits for every $600,000 he deposited. The $60,000 was delivered to Plaintiff's account through a series of three transactions separated by a number of days to conceal the arrangement.

FanDuel was thoroughly aware of Plaintiff's addiction through, and among other things, the data it actively collected and monitored on his massive deposits, amounts bet, and frequency of bets. FanDuel was also in near-daily contact with Plaintiff through its VIP host. FanDuel preyed on Plaintiff by using its information about his addiction to target him for enticements including well over a million dollars in FanDuel credits and lavish gifts to ensure that he deposit money and gamble in amounts and frequencies that only an addict could ever gamble.

Part of FanDuel's predatory gambling practice was intentionally ignoring its own responsible gaming protocol, and knowing and/or taking intentional steps to avoid knowing that the money gambled by Plaintiff was stolen or otherwise not from a legitimate source. FanDuel circumvented its own Know Your Customer (KYC), anti-money laundering (AML), and customer due diligence (CDD) standards and requirements -- again to ensure that Plaintiff continue depositing and gambling in massive amounts and frequencies.

To be clear, this suit does not allege liability on the basis that FanDuel passively permitted an addicted gambler to use its platform. Rather, this suit alleges violation of statutory and common law because FanDuel actively and intentionally targeted and preyed on Plaintiff with incentives, credits, and gifts to create, nurture, expedite, and/or exacerbate his addiction with the only possible outcome that he would ultimately hit rock bottom.

Despite FanDuel's refrain to the contrary, there is nothing unsubstantiated about Plaintiff's claims. Plaintiff's Amended Complaint lists FanDuel's enticements in painstaking

detail including, and among many other things, $1,107,883 in FanDuel credits to ensure he continued depositing and gambling. These enticements are summarized in the Amended Complaint from Paragraph 39 through 53, and then described with specificity from Paragraph 130 through 237. The symptoms of Patel's gambling addiction, all fully visible to FanDuel, are listed in Paragraph 87 through 129.

## **LEGAL ARGUMENT**

### **I.**

### **Patel's Claims are Not Subject to the Binding Arbitration in Section 15.2 Because Application is Limited by the Plain Language of Section 15.1 and Terms of Use**

FanDuel insists it is entitled to enforcement of the *Binding Arbitration* clause located at Section 15.2 of its Terms of Use,[1] but fails to acknowledge or make any mention of Section 15.1, which defines and limits the scope of disputes subject to arbitration by 15.2. The only disputes subject to mandatory arbitration pursuant to 15.2 are those which are first subject to *Initial Dispute Resolution* with FanDuel's customer support department as set out in 15.1. The disputes subject to this process are defined by the terms of 15.1 to include "any concerns you may have regarding the Service." "Service" is defined in the Terms of use as "[t]he site, the mobile app, and any other features, tools, materials or other services (included co-branded or affiliated services) offered from time to time by FanDuel…" The delegation clause, also contained in 15.2, suffers the same fatal flaw and is limited to the same disputes over the "Service" as required by 15.1.[2]

---

[1] Though FanDuel is unclear about which of its Terms of Use it is relying upon, the Plaintiff focuses on the 2020 update based on the date of the allegation in the Complaint stating "FanDuel actively participated in and grew the addiction of Plaintiff beginning no later than July 19, 2021 when FanDuel first executed a custom clandestine enticement scheme providing Plaintiff with $60,000 in credits for every $600,000 he deposited."

15.1 states in full:

**15.1 Initial Dispute Resolution**

Our Customer Support Department is available via the web to address any concerns you may have regarding the Service. Our Customer Service Department can resolve most concerns quickly to our players' satisfaction. The parties shall use their best efforts through this Customer Service process to settle any dispute, claim, question, or disagreement and engage in good faith negotiations which shall be a condition to either party initiating a lawsuit or arbitration. Failure to engage in this process could result in the award of fees against you in arbitration.

15.2 then begins with explicit reference to the process set forth in 15.1:

**15.2 Binding Arbitration**

If the parties do not reach an agreed upon solution within a period of 30 days from the time informal dispute resolution begins under the Initial Dispute Resolution provision, then either party may initiate binding arbitration as the sole means to resolve claims, subject to the terms set forth below…

Binding arbitration is thereby limited to disputes eligible for resolution by FanDuel's Customer Support Department over the site, mobile app, and any other features, tools materials, or other services offered from time to time. Not only is there no mention of the VIP program, or VIP hosts, or customized inducements in the definition of Services, it is not mentioned anywhere else in the Terms of Use either. Moreover, the Terms of Use *do* include a section with significant detail under the header **5.6 Bonuses and Promotions**, but again makes no mention of the VIP program and VIP hosts at issue in this litigation.

For example, 5.6 discusses the timing and logistics of "bonuses to newly depositing users and for other marketing purposes" and "monetary credits for players competing in 'Beat The Expert' competitions and Giveaway/Freeroll tournaments or for referring new users to FanDuel."

---

[2] Plaintiff's brief does not respond to FanDuel's arguments regarding the purported Terms of Use from Betfair in the states of Kansas and Tennessee. By their own terms, these Terms of Use are limited to activity within the borders of Kansas and Tennessee. To the extent any acts relevant to this action took place inside Kansas and Tennessee, they were *de minimis* compared to the activity in Florida. *See* P's Amended Complaint at ¶16 ("At all times relevant to this Complaint, Plaintiff engaged in DFS activity with FanDuel while within the borders of the State of Florida.")

FanDuel certainly could have added its VIP program or interaction with its VIP hosts to its definition of "Service," discussed it under Section 5.6, 15.1, or 15.2, or elsewhere in its Terms of Use, but it chose not to. The average consumer certainly could not have understood that he was waiving his right to challenge these practices in a court of law when there is absolutely no reference to or mention of them anywhere in the Terms of Use.

Moreover, FanDuel has not submitted an affidavit to support, and certainly it would strain common sense to believe, that its Customer Support Department is standing by to resolve allegations of the alleged abuses by the VIP program and VIP host at issue in the instant litigation. Rather, a plain reading of the Terms of Use and the understanding of the average consumer must be that the Customer Support Department is trained and waiting to "resolve most concerns quickly" involving things which are referenced in the Terms of Use such as retractions of a user's bonus (5.6), cancelation of a contest (4.4), the determination of the winner of a contest (5.1), or prize calculations (5.4).

## II.

**Patel's Claims are Not Arbitrable Because the Parties Never Agreed to Arbitrate Issues of Fraud or Tort Involving FanDuel's VIP Program, VIP Hosts, and the Predatory Practices Outlined in the Amended Complaint**

"In Granite Rock, the Supreme Court clarified 'the proper framework for deciding when disputes are arbitrable.'" Local Union 97, IBEW v. Niagara Mohawk Power Corp., 67 F.4th 107, 112 (2d Cir. 2023) *quoting* Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 296 (2010). Granite Rock reaffirmed and strengthened the principle that "'a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to

arbitrate *that dispute*.'" <u>Niagara Mohawk Power Corp.</u> at 112-13 (emphasis in original) *quoting* <u>Granite Rock</u> at 297.

      An arbitrator's authority is derived by and limited to those issues which the parties agreed to submit to arbitration. *See* <u>Niagara Mohawk Power Corp.</u> at 113 ("Because 'arbitration is a matter of contract…arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.'") *quoting* <u>Granite Rock</u> at 297 (quoting <u>AT&T Techs., Inc. v. Communications Workers of America</u>, 475 U.S. 643, 648-49 (1986). "The FAA was intended to 'make arbitration agreements as enforceable as other contracts, *but not more so*." <u>McFarlane v. Altice USA, Inc.</u>, 524 F.Supp. 3d 264, 274 (S.D.N.Y. 2021)(emphasis in original). "The words expressed must be judged according to 'what an objective, reasonable person would have understood them to convey.'" <u>Wexler v. AT&T Corp.</u>, 211 F.Supp. 3d 500, 504 (S.D.N.Y. 2016) *quoting* <u>Leonard v. PepsiCo, Inc.</u>, 88 F.Supp. 2d 116, 127 (S.D.N.Y. 1999).

      Plaintiff of course does not dispute a federal policy favoring arbitration, but "courts should not 'use policy considerations as a substitute for party agreement.'" <u>Niagara Mohawk Power Corp.</u> at 113 *quoting* <u>Granite Rock</u> at 303 (quoting <u>Gateway Coal Co. v. Mine Workers</u>, 414 U.S. 368, 377 (1974). A motion to compel arbitration is only properly granted upon a finding that the parties consented not just to arbitrate, but arbitrate the particular dispute in question. *See* <u>Niagara Mohawk Power Corp.</u> at 113 ("A court may only compel arbitration where it is 'satisfied that neither the formation of the parties' arbitration agreement *nor*…its enforceability or applicability to the dispute is in issue.'")(emphasis in original) *quoting* <u>Granite Rock</u> at 299. Stated more bluntly, "The Federal Arbitration Act 'does not require parties to

arbitrate when they have not agreed to do so.'" <u>Sanchez v. Clipper Realty, Inc.</u>, 2023 WL 7272062, * 3 (2d Cir. Nov. 3, 2023).

The presumption to which FanDuel claims entitlement applies only to a "narrow set of circumstances," is rebuttable, and does nothing more than "simply assist[] in resolving arbitrability disputes." <u>Niagara Mohawk Power Corp.</u> at 113 ("In the narrow set of circumstances where a court finds that the parties have entered into a valid and enforceable agreement to arbitrate, but the agreement is 'ambiguous' about whether it covers the dispute at hand,' the court may apply a 'presumption of arbitrability.' The presumption, however, is rebuttable and 'simply assists in resolving arbitrability disputes.'" *Quoting* <u>Granite Rock</u> at 301-02. Stated another way, "the presumption of arbitrability is a court's last, rather than first, resort…because to presume that a dispute is arbitrable because an arbitration clause is framed broadly runs the risk of requiring parties to arbitrate disputes they did not consent to be arbitrated." <u>Niagara Mohawk Power Corp.</u> at 114 *citing* <u>Granite Rock</u> at 298-99.

But no such ambiguity exists in the instant matter. There is no reference to anything in the Terms of Use which could even arguably be interpreted by a reasonable consumer as a reference to FanDuel's VIP program, VIP hosts, and the abuses outlined in the Plaintiff's Complaint. "Unambiguous contract language is not rendered ambiguous by competing interpretations of it urged in litigation." <u>Photopaint Techs., LLC v. Smartlens Corp.</u>, 335 F.3d 152, 160 (2d Cir. 2003). The terms in a contract must be assigned their plain and ordinary meaning. *See* <u>Starr Indem. & Liab. Co. v. Brightstar Corp.</u>, 388 F.Supp. 3d 304, 324 (S.D.N.Y. 2019)("'unambiguous provisions of a [] contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court.'") *quoting* <u>Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 16 N.Y.S. 3d 21, 37 (2015). "If a

company wishes to bind its customers to something broader, it must take steps to secure something that a reasonable person would understand as an objective expression of his or her agreement." <u>Wexler</u> at 504.

It is appropriate for this Court to determine the issue of arbitrability based on the limitation of 15.2 set forth in 15.1. "'If a party challenges the validity of the precise agreement to arbitrate at issue, the federal court *must* consider the challenge before ordering compliance with that arbitration agreement.'" <u>N.Y. Knicks, LLC v. Maple Leaf Sports & Ent. Ltd.</u>, 2024 WL 3237563, *22 (S.D.N.Y. Jun. 28, 2024) *quoting* <u>Rent-A-Center, W., Inc. v. Jackson</u>, 561 U.S. 63, 71 (2010). *See also* <u>Gingras v. Think Fin., Inc.</u>, 922 F.3d 112, 126 (2d Cir. 2019)(though arbitration clause purported to "give the arbitrator blanket authority over the parties' disputes…plaintiffs mount a convincing challenge to the arbitration clause itself" requiring district court to decide question of arbitrability).

## III.

## FanDuel's Interpretation Would Create an Unenforceable "Infinite Arbitration Clause"

Despite the limiting language in 15.1, FanDuel is essentially asking the Court to enforce the language in 15.2 as an "infinite arbitration clause," using the phrase "the parties' relationship with each other" as a catchall for those issues which the parties never agreed to arbitrate. Not only is FanDuel's position inconsistent with the plain language of the Terms of Use, but such catchall language is unenforceable under New York contract law. The Court considered such a clause in <u>McFarlane v. Altice USA, Inc.</u>, 524 F.Supp. 3d 264, 275 (S.D.N.Y. 2021).

In <u>Altice</u>, the Court discussed an arbitration clause requiring "any and all disputes" arising between the customer and defendants at substantial length. The clause "is thus an

example of a 'relatively new and untested' species of arbitration clause, which one scholar has aptly dubbed an 'infinite arbitration clause (which)…'[i]f enforced according to its terms, such a clause would seem to mandate arbitration of any claim between the parties, including those without any nexus whatsoever to the agreement containing the clause." <u>Ibid</u>. (internal citations omitted). "There is relatively little case law addressing (infinite arbitration clauses). Most of what there is, however, has taken a jaundiced view of the argument that they should be enforced according to their terms." <u>Ibid</u>. As did the few courts considering this issue before them, the Court relied heavily upon the reasoning of Judge Posner in a case between a borrower and lender, finding such a clause unconscionable:

> If Instant Cash murdered Smith in order to discourage defaults and her survivors brought a wrongful death suit against Instant Cash, Instant Cash could insist that the wrongful death claim be submitted for arbitration. For that matter, if an employee of Instant Cash picked Smith's pocket when she came in to pay back the loan, and Smith sued the employee for conversion, he would be entitled to arbitration of her claim… <u>Altice</u> at 275 *quoting* <u>Smith v. Steinkamp</u>, 318 F.3d 775 (7th Cir. 2003).

Such a limitless clause is not merely susceptible to invalidation under principles of unconscionability, but under standard principles of contract formation as well. For further guidance, <u>Altice</u> relied on <u>Hearn v. Comcast Cable Communications, LLC</u>, 415 F.Supp. 3d 1155 (N.D. Ga. 2019). In <u>Hearn</u>, Comcast's motion to compel arbitration was denied, with the District Court "decrying the 'absurd results' that 'would invariably ensure if federal courts began compelling arbitration of claims that are substantively and temporally unmoored from the agreements containing the arbitration provisions.'" <u>Altice</u> at 276 *quoting* <u>Hearn</u> at 1164. "In the <u>Hearn</u> Court's view, however, the problem was not one of unconscionability, but rather 'one of contract formation.'" <u>Ibid</u>.

A clause requiring every issue between the parties to be arbitrated is wholly inconsistent with the bedrock contract principle that the parties can only be bound to what a reasonable consumer would have understood they were binding themselves to. <u>Altice</u> at 276 ("'No reasonable customer would have understood himself to be signing over his right to pursue any claim against the defendant in perpetuity simply by signing a work order acknowledging receipt of a 2016 Service Agreement.'") *quoting* <u>Hearn</u> at 1165. "So too, no 'reasonable company in the defendant's position could understand the customer's manifestation of assent to effect an absolute waiver of the customer's right to sue the defendant in state or federal court with respect to claims unrelated to the 2016 Service Agreement." <u>Ibid</u>. <u>Hearn</u> added to Judge Posner's concerns: "[i]f the Plaintiff was run over by a Comcast truck, he would be required to submit his personal injury claim to arbitration…" <u>Altice</u> at 277 *quoting* <u>Hearn</u> at 1162.

"As a matter of contract formation, New York law, like Georgia law, provides that 'a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'" <u>Altice</u> at 276 *quoting* <u>Greenwich Capital Fin. Prods., Inc. v. Negrin</u>, 903 N.Y.S. 2d 346, 348 (1st Dep't 2010). The Court in <u>Altice</u> ultimately held the infinite arbitration clause unenforceable, declining to choose whether it was doing so based on unconscionability or contract formation, because "both ultimately lead to the same destination…" <u>Altice</u> at 276 *quoting* <u>Hearn</u> at 1165. ("The Court agrees with these cases and concludes that it need not choose a single path because both ultimately lead to the same destination: a conclusion that, under New York law, the Arbitration Provision cannot be applied to claims lacking a nexus to the Altice cable service agreement.")

The Southern District evaluated a similar arbitration clause in <u>Davitashvili v. GrubHub Inc.</u>, 2023 U.S. Dist. LEXIS 44780, *27 (S.D.N.Y. Mar. 16, 2023). "Under New York law, 'an

unconscionable contract has been defined as one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'" GrubHub at *27 *quoting* Gillman v. Chase Manhattan Bank, N.A., 537 N.Y.S.2d 280, 282 (2012). The Court provided a series of examples of causes of action for which a requirement to arbitrate would be unconscionable and contrary to the reasonable consumer's expectations: securities fraud, personal injury, and wrongful termination. GrubHub at *28. "Accordingly, 'as a matter of general unconscionability doctrine, defendants' arbitration clauses must be construed to apply only to claims that have some nexus to the contract of which it is a part.'" Ibid. *quoting* McFarlane at 524.

Requiring arbitration in the instant matter would produce a result just as absurd as the cases discussed in Altice. Not only is FanDuel's VIP program, VIP host, and the abuses at issue in this litigation not referenced anywhere in the Terms of Use, there is no language in the contract or evidence of any other kind that either party contemplated a waiver of Plaintiff's right to litigate the abuses or causes of action at issue in this case.

The claims at issue in this case cannot possibly arise out of the performance of the Terms of Use because the Terms are wholly silent on the issues in this matter -- this entire case can be litigated to completion without the need to ever reference the Terms of Use. The Plaintiff's claims are a far more appropriate parallel to the pickpocketing, fraud, and personal injury held not subject to arbitration than to routine disputes involving "Service" set forth by and envisioned by parties to the Terms of Use.

**IV.**

**The Declaration of Ron Salabit is Insufficient to Establish Notice**

The argument above generously assumes *arguendo* that FanDuel has submitted evidence sufficient to carry its burden of demonstrating the Plaintiff was on notice of its Terms of Use, despite the fact it has failed to do so. The Declaration from Ron Salabit, FanDuel's self-professed Customer Experience Recovery Manager, provides no basis for its conclusions, and concedes that FanDuel has no way to determine whether the Plaintiff received its 2020 Terms of Use or not.

The standard for a motion to compel is "'similar to that applicable for a motion for summary judgment.'" Ohio Sec. Ins. Co. v. Kinsale Ins. Co., 2024 U.S. Dist. LEXIS 229815, *6 (S.D.N.Y. Dec. 17, 2024) *quoting* Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016). As such, the Court is to "draw all reasonable inferences in favor of the non-moving party." Ibid.

Salabit professes personal knowledge of FanDuel's practices back in 2014, but gives no indication as to whether or not he was employed by FanDuel at that time. While Salabit certainly could have reviewed records to familiarize himself with FanDuel's 2014 practices, no such records are identified other than the most reference to "FanDuel's business records." *See* Dec. of Salabit at ¶¶4, 6, 8. Reference to such records are meaningless without their attachment to the Certification, but the records are not merely not included, they are not even identified. Similarly, Salabit on multiple occasions relies on "his knowledge," but provides no insight of any kind as to the derivation or scope of that knowledge. *See* Dec. of Salabit at ¶¶6, 7, 15. This is especially relevant here, where he professes personal knowledge of FanDuel systems over nearly a decade between 2014-2023, without any indication of when he began working for the Defendant.

FanDuel similarly fails to demonstrate that the Terms of Use at issue in the instant motion, from October 2020, were delivered to or received by the Plaintiff. Salabit is only able to state generally that all users were sent an email entitled "Terms of Use Update," but is unable to certify that the email was sent to the Plaintiff or produce the email that was sent to him. He states that Plaintiff was an active user on the date of the email, December 16, 2020, and that the exhibit annexed to his certification is a true and accurate copy of the email he should have received, but there is again no indication how these conclusions were reached.

To the extent the Court disagrees and finds the Declaration of Salabit adequate to prove delivery and existence of the emails and screens in the manner alleged, Plaintiff does not dispute that the series of screens and communications, if received, would be sufficient to place a reasonable user on notice of the agreement.

<u>**CONCLUSION**</u>

For the reasons set forth herein, FanDuel's motion to compel arbitration and stay this matter should be denied in its entirety.

Dated: February 28, 2025

LITT LAW, LLC

_____
By: Matthew R. Litt, Esq.
Mailing Address:
789 Farnsworth Avenue
Bordentown, New Jersey 08505
Phone: (908) 902-7071
MLitt@LittLaw.Net

<u>WORD COUNT CERTIFICATION</u>

I hereby certify that the total number of words in this memorandum of law, excluding the caption, table of contents, table of authorities, signature block, and word count certification is 3,921.