**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMIT PATEL,<br><br>    Plaintiff,<br><br>v.<br><br>FAN DUEL, INC.; XYZ CORPS. 1-10; JANE AND JOHN DOES 1-10,<br><br>    Defendants. | Civil Action No.: 1:24-cv-07402-VSB<br><br>***ORAL ARGUMENT REQUESTED*** |

---

# Plaintiff Amit Patel's Memorandum of Law in Opposition to Defendant FanDuel Inc.'s Motion to Dismiss

---

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………………… 3

PRELIMINARY STATEMENT…………………………………………………….. 6

STATEMENT OF FACTS…………………………………………………………….. 8

LEGAL ARGUMENT………………………………………………………………… 13

    I.     Rule 12(b)(6) Motion to Dismiss Standard…………………………. 13

    II.    The Complaint Adequately "Nudges its Claims from Conceivable

         to Plausible"…………………………………………………………. 13

         A.  FanDuel Seeks an Unmerited Extension of Florida's Wrongful Conduct
             Doctrine…………………………………………………………. 13

         B.  FanDuel's Years-Long Growth of Plaintiff's Addiction
             was "Outrageous"……………………………………………….. 17

         C.  Plaintiff's Complaint Provides Adequate Detail of his Severe Emotional
             Distress……………………………………………………….. 20

         D.  Plaintiff's Complaint Provides Detailed Allegations of FanDuel's Causation
             of Damages…………………………………………………… 21

         E.  FanDuel Owed the Plaintiff a Duty Because it Created a
             Foreseeable Harm……………………………………………….. 23

         F.  Plaintiff's Liability for the Money at Issue is an Out-of-Pocket Loss Under
             FDUTPA………………………………………………….... 29

         G.  Civil Conspiracy……………………………………………… 30

CONCLUSION……………………………………………………………… 30

WORD COUNT CERTIFICATION……………………………………………… 31

# TABLE OF AUTHORITIES

## Cases

Allstate Ins. Co. v. Auto Glass Am., LLC, 418 F. Supp. 3d 1009 (M.D. Fla. 2019)…….   29

Ashcroft v. Iqubal, 556 U.S. 662 (2009)………………………………………………   13

Ashwood v. Patterson, 49 So. 2d 848 (Fla. 1951)……………………………………….   14

ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007)………….   13

Bailey v. St. Louis, 196 So. 3d 375 (Fla. 2d DCA 2016)………………………………..   29

Barker v. Kallash, 63 N.Y.2d 19 (NY 1984)…………………………………………….   16

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)………………………………………   13, 22

Bongiorno v. Americorp., Inc., 159 So. 3d 1027 (Fla. 5th DCA 2015)…………………   25

Calderon v. Sixt Rent a Car, LLC, 114 F.4th 1190 (11th Cir. 2024)……………………   29

Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.,
169 So. 3d 164 (Fla. 4th DCA 2015)……………………………………………………   29

Clay Elec. Co-op., Inc. v. Johnson, 873 So. 2d 1182 (Fla. 2003)………………………   24

Dependable Life Ins. Co. v. Harris, 510 So. 2d 985 (Fla. Dist. Ct. App. 1987)………..18, 19, 25

Dominguez v. Equitable Life Assurance Soc'y of U.S.,
438 So. 2d 58 (Fla. Dist. Ct. App. 1983)……………………………………………….   18

Earth Trades, Inc. v. T&G Corp., 108 So.3d 580 (Fla. 2013)…………………………   15

Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227 (3d Cir. 1994)……………………..     23, 28

Hakimoglu v. Trump Taj Mahal Assocs., 70 F.3d 291 (3d Cir. 1995)…………………     27, 28

Hammer v. Sorensen, 824 Fed. Appx. 689 (11th Cir. 2020)……………………………     19

Hollis v. Miami-Dade County, 2022 WL 4124300 (S.D. Fla. Aug. 10, 2022)…………     20, 21

In re Jan. 2021 Short Squeeze Trading Litig., 76 F. 4th 1335 (11th Cir. 2023)………..     24

Jacobson v. Pfizer, Inc., 618 F. App'x 509 (11th Cir. 2015)…………………………...     14

Kaminer v. Eckerd Corp. of Fla., Inc., 966 So. 2d 452 (Fla. Dist. Ct. App. 2007)……..     14

Knauer v. Jonathon Roberts Financial Group, Inc., 348 F.3d 230 (7th Cir. 2003)……..     15

Land Title of Cent. Fla., LLC v. Jimenez, 946 So. 2d 90 (Fla. 5th DCA 2006)………..     25

Littlejohn v. City of New York, 795 F. 3d 297 (2d Cir. 2015)…………………………     13

Kim v. Jung Hyun Chang, 249 So. 3d 1300 (Fla. Dist. Ct. App. 2018)………………...     19

Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277 (Fla. 1985)…………………………     17

Minto v. Molloy College, 2019 WL 4696287 (E.D.N.Y. Sept. 26, 2019)………………     13

Monroe v. Sarasota Cnty. Sch. Bd., 746 So. 2d 530 (Fla. Dist. Ct. App. 1999)………...     24

Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.,
187 So. 3d 868 (Fla. 3d DCA 2016)……………………………………………………..     29

<u>Official Cmte. Of Unsecured Creditors of PSA, Inc. v. Edwards</u>,

347 F.3d 1145 (11th Cir. 2006)………………………………………………………  15


<u>Pearlman v. Alexis</u>, 2009 WL 3161830 (S.D. Fla. Sept. 25, 2009)………………………  15


<u>Plowright v. Miami Dade County</u>, 102 F.4th 1358 (11th Cir. 2024) …………………17, 18, 21


<u>Rosenfeld Gallery, LLC v. Truist Bank</u>, 719 F.Supp. 3d 1270 (S.D. Fla. 2024)………….  22


<u>Taveras v. Resorts Int'l Hotel, Inc.</u>, 2008 WL 4372791 (D.N.J. Sept. 19, 2008)………25, 26, 27


<u>Tiara Condo. Ass'n v. Marsh & McLennan Cos.</u>, 110 So. 3d 399 (Fla. 2013)……………23, 24


<u>Virgilio v. Ryland Grp., Inc.</u>, 680 F.3d 1329 (11th Cir. 2012)……………………………  24


<u>Williams v. City of Minneola</u>, 575 So. 2d 683 (Fla. Dist. Ct. App. 1991)……………….  18


<u>ZP No. 54 Ltd. P'ship v. Fidelity & Deposit Co. of Md.</u>,

917 So. 2d 368 (Fla. 5th DCA 2005)………………………………………………...  25

**Other**

American Psychiatric Association's Diagnostic and Statistical Manual of

Mental Disorders 4 ("DSM-4-TR")…………………………………………………  27


American Psychiatric Association's Diagnostic and Statistical Manual of

Mental Disorders 5 ("DSM-5-TR")………………………………………………… 10, 27


<u>Restatement (Second) of Torts</u> § 46……………………………………………………  17, 19


World Health Organization's International Classification of Diseases…………………..  10

## PRELIMINARY STATEMENT

As Defendant FanDuel, Inc. ("FanDuel" or "Defendant") does in the pending motion to compel arbitration, it artificially reduces and mischaracterizes this action as a foolish attempt to shift blame for the actions of the Plaintiff Amit Patel ("Plaintiff" or "Patel"), despite knowing he was a gambling addict while actively and aggressively sustaining and growing that addiction. Plaintiff is not blameless, and nowhere in the Amended Complaint does he claim to be. But while Patel is in prison paying for his transgressions, FanDuel asks the Court to wholly forgive and ignore their wrongdoings. To be clear, not only did FanDuel knowingly and actively participate in and aggressively grow Patel's addiction, they are the singular party to gain from the addiction's consequences; Patel is in prison and his former employer lost over $20,000,000 -- while FanDuel profited and still holds onto millions.

To place this motion and litigation in its proper context, it is important to recognize that it is not just Plaintiff and his attorney who believe FanDuel shares responsibility for sustaining and growing Patel's addiction as FanDuel would have this Court believe. More specifically, Dan Taylor, Chief Executive Officer of Flutter International, the owner and operator of FanDuel, has spoken out about the predatory behavior which Plaintiff seeks to redress in this action.

Taylor testified before Parliament in the United Kingdom on February 4, 2020: "From my perspective, the key thing is that we have heard loud and clear the valid criticisms: encouraging customers to spend more than they can afford has no place in this industry and certainly none in any business that I run. This is the way that we operate these schemes: before you can become a managed customer, you have to go through affordability checks, which include source of funds - providing payslips and any other documents to prove that." FanDuel

never required the Plaintiff to provide a single payslip or documentation of any kind from Patel -- this would not have happened if they had.

As another example, Taylor testified: "All our key account managers and anyone working in our customer service team go through responsible gambling training. If any customers use certain language, phrases or behaviors, these are immediate triggers. They are passed over to our responsible gambling team, who intervene and decide whether they will impose deposit limits or close the account. We have used that training embedded into our business to ensure that we protect those customers. It is absolutely core to the way that that happens." Over the course of more than $20,000,000 in deposits with FanDuel, the Plaintiff triggered many red flags. Not only was he not passed to a responsible gambling team with deposit limits imposed or his account closed, his incentives were sustained and escalated. FanDuel did not merely not protect him as Flutter testified to be "absolutely core," they actively took advantage of him.

While Taylor's testimony may not be evidentiary or material to determination of a 12(b)(6) motion, it is critical that FanDuel not be permitted to frame this motion and litigation as "wild and unsubstantiated" when its own parent deplores the scheme complained of in this suit.

Finally, while FanDuel advocates for imposition of the Terms of Use in its pending Motion to Compel Arbitration, it has evidently abandoned that position in the instant Motion to Dismiss, choosing instead to argue Florida rather than New York law. The Terms of Use require application of New York law; Florida law would therefore only apply if the Terms of Use are first found by this Court to be unenforceable.

## STATEMENT OF FACTS

*The Plaintiff's Statement of Facts are drawn from the allegations contained in the Amended Complaint ("Complaint"), which is incorporated by reference in full herein. Citations in this Statement of Facts are to the Paragraph numbers in that Complaint.*

Plaintiff gambled over $20 Million dollars with FanDuel on daily fantasy sports ("DFS") between late 2019 and early 2023. FanDuel actively participated in and grew the addiction of Plaintiff beginning no later than July 19, 2021 when FanDuel first executed a custom clandestine enticement scheme providing Plaintiff with $60,000 in credits for every $600,000 he deposited. The $60,000 was always delivered to Plaintiff's account through a series of three transactions separated by a number of days to conceal the arrangement. (Intro.)

FanDuel was thoroughly aware of Plaintiff's addiction through, and among other things, the data it actively collected and monitored on his massive deposits, amounts bet, and frequency of bets. FanDuel was also in near-daily contact with Plaintiff through its VIP host. FanDuel preyed on Plaintiff by using its information about his addiction to target him for enticements including well over a million dollars in FanDuel credits and lavish gifts to ensure that he deposit money and gamble in amounts and frequencies that only an addict could ever gamble. (Intro.)

Part of FanDuel's predatory gambling practice was intentionally ignoring its own responsible gaming protocol, and knowing and/or taking intentional steps to avoid knowing that the money gambled by Plaintiff was stolen or otherwise not from a legitimate source. (Intro.)

To be clear, this suit does not allege liability on the basis that FanDuel passively permitted an addicted gambler to use its platform. Rather, this suit alleges violation of statutory and common law because FanDuel actively and intentionally targeted and preyed on Plaintiff with incentives, credits, and gifts to create, nurture, expedite, and/or exacerbate his addiction with the only possible outcome that he would ultimately hit rock bottom. (Intro.)

**FanDuel's VIP Host**

Plaintiff was designated by FanDuel for its VIP status in or about 2021, and assigned VIP host Brett Krause ("Krause"). Plaintiff and Krause often communicated as much as 100 times every day between late 2021 and early 2023. On several occasions, FanDuel contacted Plaintiff through Krause on a day he was not gambling to find out why he was not gambling. Communications from FanDuel, through Krause, to Plaintiff frequently began first thing in the morning, and continued throughout the day until late at night. Krause accompanied the Plaintiff on the lavish trips sponsored by FanDuel; Krause's girlfriend even joined Krause and Plaintiff on one of these trips. (¶¶ 9-14).

**Gambling Addiction Disorder**

The Plaintiff was an addicted gambler, and exhibited fundamental symptoms of being addicted to gambling to FanDuel. These symptoms included, but were not necessarily limited to, the massive amount of money deposited and wagered by Plaintiff on FanDuel's DFS contests, massive frequency of wagers placed by Plaintiff on FanDuel's DFS contests, exponential growth in money wagered and DFS contests entered with FanDuel, Plaintiff's demonstrated preoccupation with gambling on FanDuel's DFS contests, Plaintiff's gambling with increasing amounts of money on FanDuel's DFS contests to chase his losses, binge gambling on FanDuel's DFS contests, Plaintiff's cancellation of his own withdrawals on FanDuel's site, the massive amount of time spent by Plaintiff on FanDuel's site. (¶¶27-28).

The Plaintiff was diagnosed with severe gambling disorder by the Florida Recovery Center in or about April 2023, and has not placed a bet since March 21, 2023. Gambling disorder is classified by both the American Psychiatric Association's Diagnostic and Statistical Manual of

Mental Disorders ("DSM-5-TR") and World Health Organization's International Classification of Diseases as an addictive disorder, alongside alcohol, opioid, hallucinogen, sedative, stimulant, and tobacco use disorders. (¶¶29-30).

**FanDuel's Active Participation in Sustaining and Growing Plaintiff's Addiction**

At all times relevant to this Complaint, FanDuel and its customer-facing employees were trained in the recognition of the nature and symptoms of problem gambling behavior. At all times relevant to this Complaint, FanDuel knew, whether by training and/or experience, the nature and symptoms of problem gambling behavior. At all times relevant to this Complaint FanDuel knew, whether by training and/or experience, that between 70% – 80% of addicted gamblers will commit a felony to obtain money with which to gamble. FanDuel's involvement in Plaintiff's gambling addiction was not passive. FanDuel knew Plaintiff was an addicted gambler because from approximately late 2019 through early 2023, they engaged with him through email, telephone, and text message on an almost daily basis. (¶¶31-35).

 FanDuel's enticements to Plaintiff to gamble included relentless financial incentives, lavish trips, event tickets, and other gifts. Such enticement from FanDuel included approximately $1,107,883 in FanDuel credit. Such enticement from FanDuel included a system whereby Plaintiff was incentivized by FanDuel to continue reaching deposits of at least $600,000 to attain a FanDuel credit of $60,000. The $60,000 in FanDuel credit was delivered by FanDuel through a series of three payments to avoid the suspicions of FanDuel's own compliance personnel. This incentivization mechanism was created by FanDuel specifically for the Plaintiff. (¶¶39-43).

The enticements from FanDuel are summarized in the Complaint from Paragraphs 39 through 53, and described with specificity from Paragraph 130 through 237. The symptoms of

Patel's gambling addiction, all fully visible to FanDuel, are listed in Paragraph 87 through 129. The full list and detail of these items is not repeated herein, for purposes of judicial economy.

**FanDuel's Circumvention of its Own Standards to Sustain and Grow Plaintiff's Addiction**

In or about early 2023, FanDuel identified one or more of the Plaintiff's transactions as suspicious. As a result of the identification set forth in the immediately preceding paragraph, FanDuel told Plaintiff through Krause that he would have to verify the source of funds being deposited with its site for gambling. More specifically, the Plaintiff's VIP host informed Plaintiff that FanDuel's AML department required a verification of his source of funds. Days later, and without Plaintiff providing verification of any kind, FanDuel informed Plaintiff that "We got around it" and "you owe me big time" or words to that effect, and that FanDuel was no longer requesting verification. (¶¶61-64).

Krause moved certain of his text messages with Plaintiff to Krause's personal cell phone to avoid detection by FanDuel's compliance personnel, while instructing Plaintiff to fabricate additional back-and-forth dialogue on his FanDuel phone to make sure it appeared to FanDuel that their communication remained frequent. (¶115).

On multiple occasions FanDuel, through Krauss, instructed Plaintiff on ways to circumvent FanDuel's own program by instructing him to gamble the FanDuel credit in his account instead of withdrawing it to avoid suspicion. (¶239).

FanDuel set deposit limits for consumers, ostensibly to prevent exactly what occurred here, above which verification of a gambler's source of funds is required. But Plaintiff constantly exceeded the deposit limits without ever verifying his source of funds. Upon information and belief, FanDuel knew or took steps to intentionally avoid knowing, that the Plaintiff was using a

corporate credit card to make frequent massive deposits with FanDuel. FanDuel received deposits from Plaintiff in amounts which could only have come from a corporate credit card. (¶¶65-69).

FanDuel's own safeguards do not permit them to refund deposits or partial deposits onto the same credit card from which the deposits originated unless the player is net-positive. Krause acknowledged to Plaintiff on numerous occasions that FanDuel was "breaking AML by giving refunds back to the credit card" or words to that effect. In violation of its own safeguards, FanDuel continually refunded deposits or partial deposits onto the same credit card from which Plaintiff's deposits originated. Such refunds occurred nearly 300 times, with each refund in the amount of $25,000 for a total of approximately $6,750,000. (¶¶70-73).

### FanDuel's Daily Fantasy Sports ("DFS") Business

DFS is an online game where gamblers choose a team of real-life athletes and compete against other gamblers in a single day contest to see which team of real-life athletes produces the best results. Upon information and belief, FanDuel retains 6% of all money wagered on DFS. In a typical contest, up to thousands of people will compete against each other in a single DFS contest, wagering just a few dollars each. (¶¶75-77)

However, most of the money gambled and lost by the Plaintiff was gambled and lost on 3-person DFS contests with entry fees between $10,600 and $530,000. Entry into these 3-person DFS contests above $26,200 were specially arranged for Plaintiff by FanDuel through its VIP host, and not available to the public. FanDuel arranged 100s of such custom DFS contests for the Plaintiff. (¶¶78-80).

## <u>LEGAL ARGUMENT</u>

### I.

### Rule 12(b)(6) Motion to Dismiss Standard

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct charged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). At the motion to dismiss stage, the factual content alleged by the Complaint to reach the facial plausibility threshold must be accepted as true, and is entitled to all reasonable inferences. *See* <u>ATSI Communications, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007). Stated another way, it is the plaintiff's obligation to merely "nudge[] its claims across the line from conceivable to plausible…" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). At this stage, a plaintiff need only show "plausible support to a minimal inference of discriminatory motivation." <u>Littlejohn v. City of New York</u>, 795 F. 3d 297, 311 (2d Cir. 2015). The complaint is not required to contain "detailed factual allegations" to overcome a motion made under Rule 12(b)(6). <u>Minto v. Molloy College</u>, 2019 WL 4696287, at *5 (E.D.N.Y. Sept. 26, 2019) *quoting* <u>Iqbal</u> at 678 ("A complaint need not contain detailed factual allegations, but must contain more than mere 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action' or 'naked assertions' devoid of 'further factual enhancement.'")

### II.

### The Complaint Adequately "Nudges its Claims from Conceivable to Plausible"

### A.

### FanDuel Seeks an Unmerited Extension of Florida's Wrongful Conduct Doctrine

FanDuel asks this Court to use the wrongful conduct rule beyond any Florida Court's previous application of the doctrine. There is no case cited by FanDuel, and none could be found

by Plaintiff, applying the doctrine to a defendant alleged to have taken affirmative steps to cause the wrongful conduct at issue. Rather, in every one of the very few cases in which this doctrine was applied, the defendant's alleged tortious conduct was completely passive and/or subsequent to the plaintiff's conduct.

For example, in <u>Jacobson v. Pfizer, Inc.</u>, 618 F. App'x 509 (11th Cir. 2015) the plaintiff murdered his wife and two children. While serving three life sentences, he filed a *pro se* complaint against the drug manufacturer, "[t]he heart of all of (plaintiff's) claims was that possible side effects of Zoloft and Xanax include 'homicidal ideations' and 'homicidal actions,' that he would not have taken these two drugs had he known of these possible side effects, and that as a result of experiencing these side effects, he killed his family." <u>Id</u>. at 510-11.

In <u>Ashwood v. Patterson</u>, 49 So. 2d 848 (Fla. 1951), the plaintiffs sought an advantage in a dispute over the inheritance of certain property following a murder-suicide committed by their father, alleging entitlement because the father died subsequent to his murdered spouse. The <u>Ashwood</u> Court's findings were specific to murder and inheritance: "…some courts have invoked this principle to defeat the claim of a murder, as the surviving spouse (or those claiming under the murderer), to the whole of an estate by the entirety." <u>Id</u>. at 849 (parenthetical in original). <u>Ashwood</u> also took care to inform that the wrongful conduct rule was an equitable doctrine, and fact specific: "[t]his is not to say, however, that different facts might not develop different equities and different conclusions." <u>Id</u>. at 851.

Again in <u>Kaminer v. Eckerd Corp. of Fla., Inc.</u>, 966 So. 2d 452 (Fla. Dist. Ct. App. 2007), there is no allegation by the plaintiff that defendant took affirmative steps to cause the plaintiff's wrongful conduct. Rather, in <u>Kaminer</u> the plaintiff's estate brought a wrongful death

action against defendant drug store for its negligent failure to appropriately safeguard the drugs which killed the plaintiff.

The appropriate doctrine here, where there has been wrongdoing by both plaintiff and defendant, is the affirmative defense of *in pari delicto*, which acts as a limitation on rather than a bar to recovery. "The doctrine of *in pari delicto* is an equitable doctrine that states 'a plaintiff who has participated in any wrongdoing may not recover damages resulting from the wrongdoing.'" <u>Official Cmte. Of Unsecured Creditors of PSA, Inc. v. Edwards</u>, 347 F.3d 1145, 1152 (11th Cir. 2006). As the Plaintiff's Complaint in the instant matter makes clear, he does not dispute his own wrongdoing, and does not seek to profit from it -- he seeks to impose accountability for the active wrongdoing of the Defendant in causing these offenses.

*In pari delicto* means "in equal fault," and is only available to a defendant at the motion to dismiss stage upon a rare clear showing from the Complaint alone that defendant's fault is lesser than plaintiff's. *See* <u>Pearlman v. Alexis</u>, 2009 WL 3161830, *5, 7 (S.D. Fla. Sept. 25, 2009)("Because *in pari delicto* is an affirmative defense requiring proof of facts asserted by the defendant, it is usually not an appropriate ground for a Rule 12(b)(6) dismissal.") *citing* <u>Knauer v. Jonathon Roberts Financial Group, Inc.</u>, 348 F.3d 230, 237 n.6 (7th Cir. 2003); *see also* <u>Earth Trades, Inc. v. T&G Corp.</u>, 108 So.3d 580, 583 (Fla. 2013)("The defense of in pari delicto, however, does not require simply that both parties be to some degree wrongdoers. Rather, the parties must participate in the same wrongdoing. And they must be equally at fault.")

In the instant matter, the allegations of Plaintiff's Complaint, taken as true as they must be at this state, allege that FanDuel was more than equally at fault for deposits made once they knew Plaintiff was addicted and began a certain intensity and scheme of custom incentivization to continue and grow the addiction.

Not only does FanDuel ask the Court to apply the equitable wrongful conduct doctrine under the unprecedented circumstance of a defendant who actively pushed a plaintiff to commit the wrongful conduct at issue, but it seeks use of the stricter Florida, rather than New York, rule despite the argument in its Motion to Compel Arbitration to the contrary.

FanDuel's arguments in favor of compelling arbitration are irreconcilable with its argument in this motion under Florida law. Stated another way, an application of Florida law on this issue requires a finding that the Terms of Use and arbitration clause which FanDuel seeks to compel are unenforceable in this matter. More specifically, the Terms of Use updated October 9, 2020 offered by FanDuel in support of its Motion to Compel states at 15.7: "The terms and the relationship between you and FanDuel shall be governed by the laws of the State of New York without regard to conflict of law provisions. While Plaintiff maintains its argument contained in opposition to FanDuel's Motion to Compel that the arbitration provision in the Terms of Use is not applicable to this matter, the use of the word "relationship" in both the arbitration section (15.2) and choice of law in 15.7 requires that an application of Florida law is wholly disconsonant with a finding requiring arbitration.

New York law also has a wrongful conduct doctrine but unlike Florida, its doctrine presents a bar only in actions where the underlying conduct is likely to result in serious personal injury or to prevent an "arsonist, rapist or one engaged in similarly reprehensible misconduct from bringing an action for injuries resulting from the victim's or accomplice's carelessness." Barker v. Kallash, 63 N.Y.2d 19, 32 (NY 1984). Stated another way, the "door of a court" is only barred under New York law where the plaintiff's violation of law is "either gravely immoral or grievously injurious to the public interests." Id. at 32. (finding injury while building pipe bomb "so plainly violative of paramount public safety interests").

In the instant matter, the public interest dictates clearly in favor of permitting the Plaintiff access to the door of the court. While FanDuel focuses this Court narrowly on the Plaintiff's wrongdoing, the allegations in his Complaint against the Defendant, that FanDuel intentionally targeted an addicted gambler for exploitation and growth of his addiction, is a critical issue of wide public interest. If deprived of a reconciliation of FanDuel's involvement in the Plaintiff's addiction as alleged in great detail in the pleadings, the public interest is damaged immeasurably as FanDuel's continues imposing the same fate on countless thousands of others.

## B.

### FanDuel's Years-Long Growth of Plaintiff's Addiction was "Outrageous"

FanDuel's summary conclusion that a scheme to grow and exacerbate the addiction of a person known by them to be addicted is or should be tolerable in a civilized community is incorrect, and is legally unsupportable. Moreover, FanDuel's argument wholly ignores the durational element required to be considered in any analysis of intentional infliction of emotional distress, and that the scheme alleged in the Complaint continued unabated from at least July 2021 through early 2023.

Plaintiff of course does not dispute that the standard for outrageous conduct is high in Florida, "[b]ut it is not insurmountable." Plowright v. Miami Dade County, 102 F.4th 1358, 1368 (11th Cir. 2024). "One way to determine whether this standard is met is to consider whether 'the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Plowright at 1368 quoting Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 278-79 (Fla. 1985) quoting Restatement (Second) of Torts § 46 cmt. d.

Plowright provides several examples of circumstances meriting a finding of sufficiently outrageous conduct for a cause of action for intentional infliction of emotional distress, ranging from violent scenarios to those causing psychological trauma. Plowright at 1368. ("Florida courts have held conduct to be outrageous, for example, where: police officers showed photos and video footage from the autopsy of the plaintiffs' family member to individuals not involved in investigating his death, Williams v. City of Minneola, 575 So. 2d 683, 691 (Fla. Dist. Ct. App. 1991); an insurance agent threatened and harassed a disabled policyholder with a 'vicious verbal attack,' Dependable Life Ins. Co. v. Harris, 510 So. 2d 985, 988-89 (Fla. Dist. Ct. App. 1987); an insurance agent intentionally misrepresented to a policyholder that he was no longer deemed disabled to get him to surrender the policy, Dominguez v. Equitable Life Assurance Soc'y of U.S., 438 So. 2d 58, 61-62 (Fla. Dist. Ct. App. 1983); and an insurer directed the owner of a pet store not to tell the plaintiff that the skunk that bit her might have had rabies, Kirkpatrick v. Zitz, 401 So. 2d 850, 851 (Fla. Dist. Ct. App. 1981) (per curiam))."

Dependable Life Ins. Co. v. Harris is particularly instructive. In Dependable Life, the Florida District Court of Appeal found sufficiently outrageous conduct where an insurance company verbally assaulted a client by calling him a "cheat" and a "fraud" and attempted to frighten him from collecting under his policy of insurance causing him to have his car repossessed, file for bankruptcy, and become severely depressed. Id. at 987.

In finding such conduct, the Court of Appeal relied heavily on the fact that the insurance carrier "ha[d] the power to severely damage the other." Id. at 988. ("[T]here is authority for the view that a heightened degree of outrageousness can be supplied by the unequal positions of the parties in a relationship which gives rise to the tort, where one asserts and has the power to severely damage the other.")

The Court of Appeal also relied on the insurance carrier's knowledge of its customer's vulnerability: "In addition, another factor recognized as enhancing the outrageousness of a defendant's conduct is the defendant's knowledge that the plaintiff is especially sensitive, susceptible, or vulnerable to injury caused by mental distress." Ibid. *citing* Restatement (Second) of Torts § 46 cmt. f. ("The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.")

An analysis of the severity of the defendant's conduct must consider both its intensity and duration of the. "In evaluating the severity of an incident, 'the intensity and the duration of the distress' are relevant factors." Hammer v. Sorensen, 824 Fed. Appx. 689, 694 (11th Cir. 2020)(finding single viewing of "gruesome" photographs lacking in requisite "substantial quality" or "enduring quality") *quoting* Kim v. Jung Hyun Chang, 249 So. 3d 1300, 1305 (Fla. Dist. Ct. App. 2018).

In the instant matter, the Complaint certainly alleges conduct by FanDuel which is so outrageous as to go beyond all possible bounds of decency, and regarded as atrocious and utterly intolerable in civilized society. FanDuel presents the Court with no authority for the proposition that the years-long exploitation of an addict's addiction, with predictably catastrophic results for the addict and nothing but monetary gain for the defendant, has been held to fall short of the appropriate "outrageous" standard.

As with the plaintiff in Dependable Life, FanDuel knew of the instant Plaintiff's vulnerability and intentionally exploited it; FanDuel knew it could exercise power over the

Plaintiff, and did so with extreme and catastrophic results. To the extent its conduct was not otherwise outrageous, its knowledge and exploitation of the Plaintiff's vulnerability certainly made it so. Moreover, the duration of FanDuel's conduct, exploiting and growing the Plaintiff's addiction and thereby his emotional distress through a scheme lasting July 2021 through early 2023 further dictates a finding of outrageousness.

FanDuel's position that the Complaint alleges merely "a more aggressive form of commonplace incentives that entertainment companies use" is a complete mischaracterization of the Plaintiff's allegations. This suit involves a customized and unprecedented exploitation of a vulnerable person's known addiction -- certainly FanDuel cannot expect the Court to take judicial notice, without any evidence whatsoever, that this type of behavior is typical. FanDuel's proposition that their conduct in this matter was "well within the bounds of the community norms" is both untrue and horrifying.

## C.

### Plaintiff's Complaint Provides Adequate Detail of his Severe Emotional Distress

The cases cited by FanDuel in support of their argument in this section contain no information about the alleged severity of the plaintiff's emotional distress. For example, the plaintiff in Hollis v. Miami-Dade County, 2022 WL 4124300, *17-18 (S.D. Fla. Aug. 10, 2022) merely alleged: "(1) [t]he conduct of Defendant was extreme and outrageous and was intended to cause and did cause Plaintiff severe emotion [sic] distress; and (2) [a]s a direct and proximate result of the conduct of Defendant, Plaintiff suffered . . . mental anguish." This is a truly threadbare allegation, which certainly did merit dismissal.

In contrast, the Court held the plaintiff's allegation of severity to be sufficient in Plowright where the Complaint stated merely that defendant's conduct caused him: "severe damaging emotional distress," including "psychological trauma, emotional distress, depression, physical trauma, pain, and suffering." Id. at 1369.

In the instant matter, it is simply untrue that the Plaintiff merely recited the legal standard and synonyms therefore. The Plaintiff's full allegation on this issue is found at ¶266 of the Amended Complaint: "The conduct of FanDuel, in whole or in part, caused the Plaintiff, in whole or in part, to suffer severe emotional distress of such a substantial quality that no reasonable person in a civilized society should be expected to endure it including, but not necessarily limited to, the prolonged agony of addiction, anticipation of incarceration, and incarceration." The specificity of "addiction, anticipation of incarceration, and incarceration" is far more akin to the statement in Plowright than that in Hollis, and is sufficient to allege the severity required for a cause of action for intentional infliction of emotional distress.

## D.

### Plaintiff's Complaint Provides Detailed Allegations of FanDuel's Causation of Damages

FanDuel's proposition that "Patel does not allege any facts about how FanDuel might have 'created his addiction'" ignores countless dozens of paragraphs in the pleading providing painstaking detail about how Defendant caused his damages. Focusing exclusively on FanDuel's absence at the inception of the Plaintiff's addiction disregards pages and pages of detailed factual allegations about its causation of the growth and exacerbation of his addiction and damages consequent thereto.

As one example, the Complaint alleges that FanDuel caused his emotional distress by growing and exacerbating the Plaintiff's addiction by having its VIP host switch to his personal cell phone to avoid detection by its own compliance personnel, while instructing the Plaintiff to fabricate dialogue with him on the host's work phone so everything appeared normal. ¶115. As another example, the Complaint alleges that FanDuel caused his emotional distress by growing and exacerbating his addiction by creating a customized scheme delivering $60,000 in credit through a series of payments to again avoid detection from its own compliance personnel. ¶42. As another example, the Complaint alleges FanDuel circumvented its own Know Your Customer, Anti-Money Laundering, and Customer Due-Diligence rules so that the Plaintiff's account would not be flagged by its compliance department and he would continue depositing massive amounts of money to its site. As one more example, the Complaint provides a full chronology of the monetary enticements provided by FanDuel to ensure the continuation and growth of the Plaintiff's addiction. *See* ¶¶ 130-240.

FanDuel's conclusion that the Complaint fails to allege causation is belied by the pleading's incredibly comprehensive allegations against it, outlining the Defendant's scheme with precision. FanDuel's conclusions that the Complaint "fails to describe how his emotional distress got worse" and that the allegations fail to show proximate cause are well outside the scope of a motion to dismiss in the context of a pleading as expansive and detailed as this one. *See* Rosenfeld Gallery, LLC v. Truist Bank, 719 F.Supp. 3d 1270, 1275 (S.D. Fla. 2024)(pleading standard to survive motion to dismiss requires merely "more than an unadorned, the-defendant-harmed-me accusation") *quoting* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). FanDuel's conclusion that "[n]o one forced Patel to embezzle" and "[h]is conviction was accordingly caused by only his own voluntary decision to steal" are precisely the issues raised

and disputed between the parties to this litigation -- while appropriate for opening jury arguments or perhaps even a motion for summary judgment, these are not issues appropriately resolved through a motion to dismiss.

E.

### FanDuel Owed the Plaintiff a Duty Because it Created a Foreseeable Harm

Describing the Plaintiff's claims as "entice(ing) him to enter fantasy sports contests" is a fundamental mischaracterization of the relevant issues. Even a perfunctory reading of the Complaint shows that the Plaintiff alleges a scheme and behavior containing far more depth and complexity than simply not entering a fantasy sports contest. *See* ¶260 ("FanDuel breached its duty of care to the Plaintiff by subjecting him to enticements to gamble which FanDuel knew or should have known would have the effect of creating, nurturing, expediting, and/or exacerbating his gambling addiction."); ¶33 ("At all times relevant to this Complaint FanDuel knew, whether by training and/or experience, that between 70% – 80% of addicted gamblers will commit a felony to obtain money with which to gamble."); ¶35 ("FanDuel knew Plaintiff was an addicted gambler because from approximately late 2019 through early 2023, they engaged with him through email, telephone, and text message on an almost daily basis."); ¶86 ("FanDuel knowingly and intentionally permitted collusion to keep Plaintiff gambling on its site, because FanDuel knew that Plaintiff was an addicted gambler and wanted to keep him gambling on its site in greater amounts and frequency.")

Florida's economic loss rule is limited to product liability matters; the doctrine has no application to the instant matter. *See* Tiara Condo. Ass'n v. Marsh & McLennan Cos., 110 So. 3d 399, 400 (Fla. 2013)("We…hold that the application of the economic loss rule is limited to products liability cases. Therefore, we recede from prior case law to the extent that it is

inconsistent with this holding.") The <u>Tiara Condo.</u> court explained: "The rule has its roots in the products liability arena, and was primarily intended to limit actions in the products liability context." <u>Id</u>. at 401. Placing an even finer point on its Opinion, the Supreme Court wrote: "Having reviewed the origin and original purpose of the economic loss rule, and what has been described as the unprincipled extension of the rule, we now take this final step and hold that the economic loss rule applies only in the products liability context. We thus recede from our prior rulings to the extent that they have applied the economic loss rule to cases other than products liability." <u>Id</u>. at 407.

    <u>Tiara Condo.</u> overruled <u>Virgilio v. Ryland Grp., Inc.</u>, 680 F.3d 1329 (11th Cir. 2012) and <u>Monroe v. Sarasota Cnty. Sch. Bd.</u>, 746 So. 2d 530 (Fla. Dist. Ct. App. 1999), the only two cases relied upon by <u>In re Jan. 2021 Short Squeeze Trading Litig.</u>, 76 F. 4th 1335 (11th Cir. 2023) on this point. Even if the economic loss rule did still apply to the instant non-product liability and non-contract matter, it should move forward based on the extraordinary circumstances of the parties' relationship. *See* <u>Monroe</u> at 531 ("We will expand the common law tort of negligence, waiving that essential element only under extraordinary circumstances which clearly justify judicial interference to protect a plaintiff's economic expectations.")

    FanDuel clearly has a duty to the Plaintiff under the fourth general source, "a duty arising from the general facts of the case[1]." *See* <u>Clay Elec. Co-op., Inc. v. Johnson</u>, 873 So. 2d 1182, 1185 (Fla. 2003). The Complaint plainly alleges the foreseeability of harm required for such a duty. *See* ¶32 ("FanDuel knew, whether by training and/or experience, the nature and symptoms of problem gambling behavior."); ¶54 ("FanDuel knew, and/or took intentional steps to avoid knowing that the money gambled by Plaintiff was stolen or otherwise not from a legitimate

---

[1] To be sure, Plaintiff's Complaint does not assert a private right of action under the BSA, KYC AML, or CDD, and so does not address FanDuel's points on that issue.

source."); ¶130 ("Between late 2019 and early 2023, FanDuel actively and relentlessly enticed the Plaintiff, whom they knew to be addicted to gambling, to ensure that he continue to deposit and gamble on its site in massive amounts and frequency."); ¶259 ("FanDuel breached its duty of care to Plaintiff by targeting him with ongoing inducements to gamble while FanDuel knew or should have known that Plaintiff was a compulsive gambler. ")

"The determination of whether a duty arises from the general facts of the case depends upon an evaluation and application of the concept of foreseeability of harm to the circumstances alleged." Bongiorno v. Americorp., Inc., 159 So. 3d 1027, 1029 (Fla. 5th DCA 2015). The determinative question is whether the defendant's conduct created a foreseeable zone of risk. *See* Bongiorno at 1029 ("'To determine whether a duty sufficient to support a negligence claim exists, one begins by determining whether the defendant by its conduct created a foreseeable zone of risk.'") *quoting* ZP No. 54 Ltd. P'ship v. Fidelity & Deposit Co. of Md., 917 So. 2d 368, 374 (Fla. 5th DCA 2005). The prudent person standard is applied in the analysis of foreseeability. *See* Bongiorno at 1029 ("'A foreseeable consequence is one that a prudent person would anticipate as likely to result from an act.'") *quoting* Land Title of Cent. Fla., LLC v. Jimenez, 946 So. 2d 90, 93 (Fla. 5th DCA 2006).

FanDuel's reliance on the Antar v. Borgata Hotel Casino & Spa, LLC matter demonstrates the feebleness of its attempt to manufacture precedent to evade liability for its heinous actions. The District Court in Antar issued only an informal Letter Order, the grounds underlying which have since been completely abandoned by the defendant casino on appeal.[2]

FanDuel's reliance on Taveras v. Resorts Int'l Hotel, Inc., 2008 WL 4372791 (D.N.J. Sept. 19, 2008) is also misplaced. The District Court's holding in Taveras is based on inapposite

---

[2] Plaintiff's counsel in the instant matter also represents Plaintiff on the Antar matter.

and outdated facts, law, and medical science. In <u>Taveras</u>, the District Court framed the question before it as whether the casino had an affirmative duty to identify and exclude gamblers from its brick-and mortar casinos who exhibited compulsive tendencies. Taveras at *14-15. The question addressed a *passive* casino which "continued to allow (plaintiff) to gamble in spite of clear indications that she was a compulsive gambler…" <u>Id</u>. at *5. The Court expressed its finding, again in terms of a passive brick-and-mortar casino, that "the great weight of authority supports Appellees' position that common-law tort principles do not require casinos to rescue compulsive gamblers from themselves."

The Plaintiff in the instant matter does not complain that FanDuel had an obligation to rescue him from himself, nor that Defendant is liable because it passively allowed him to gamble. Rather, the Plaintiff in the instant matter alleges a constant years-long stream of aggressive, affirmative acts initiated by FanDuel to sustain and grow his addiction by enticing him to deposit huge sums of money when they knew he was a compulsive gambler -- none of which was present in <u>Taveras</u>.

Moreover, the Plaintiff's allegations in this case all involved real-time digital communication and an instantly available digital gambling platform on his smartphone which was not merely absent in <u>Taveras</u>, but unimaginable when the case was decided in 2008.

Moreover, the psychiatric understanding of compulsive gambling, cited derisively by the Court in <u>Taveras</u>, has evolved dramatically in the seventeen years since that case was decided. Though inaccurate even back then, the Court's comparison of a problem gambler and casino to "a duty on shopping malls and credit-card companies to identify and exclude compulsive shoppers" was not wildly inconsistent with the understanding and characterization of problem gambling when <u>Taveras</u> was decided in 2008.

In 2008, *Pathological Gambling*, as it was then known, was categorized by the American Psychiatric Association's Diagnostic and Statistical Manual 4 ("DSM 4") as a "Disorder of Impulse Control." *See* DSM 4 at Pg. 18. Though this category of disorder did not include over-shopping as Taveras implied it did, it grouped pathological gambling together with conditions typically perceived less seriously and without sympathy such as kleptomania and pyromania. *See* DSM 4 at Pg. 18. This classification changed five years after Taveras in the American Psychiatric Association's Diagnostic and Statistical Manual 5 ("DSM 5"), published in 2013. *See* DSM 5 at Pg. 481; 585, et seq. DSM 5 renamed Pathological Gambling as *Gambling Disorder*, and reclassified it under the category of "Substance-Related and Addictive Disorders." Ibid. Now under the heading of Substance-Related and Addictive Disorders, Gambling Disorder has since 2013 been in the same category as: a) alcohol disorders, b) opioid disorders, c) hallucinogen disorders, d) sedative disorders, e) stimulant disorders, and f) tobacco disorders. Ibid.

FanDuel's reliance on Hakimoglu v. Trump Taj Mahal Assocs., 70 F.3d 291, 294 (3d Cir. 1995) is similarly flawed and desperate. The issue in Hakimoglu was exceedingly narrow, and fact-specific to New Jersey's law regarding the service of alcohol at casinos: "whether under New Jersey law a casino patron may recover from a casino for gambling losses caused by the casino's conduct in serving alcoholic beverages to the patron and allowing the patron to continue to gamble after it becomes obvious that the patron is intoxicated." Id. at 292.

In a time before New Jersey Court Rules authorized certification of a question to the New Jersey Supreme Court, the Third Circuit predicted that the New Jersey Supreme Court would not permit recovery in this scenario. Id. at 294 ("...we predict that the New Jersey Supreme Court would not permit recovery on claims such as those asserted by the plaintiff here.")

The Court's reasoning in <u>Hakimoglu</u> was specific to the service of alcohol, finding: "'[t]he State has regulated the minutiae of gaming rules and alcohol service and expressly permitted the serving of free drinks to patrons at the gaming tables.'" <u>Id</u>. 294 *quoting* <u>Greate Bay Hotel & Casino v. Tose</u>, 34 F.3d 1227, 1317 n. 8 (3d Cir. 1994).

Moreover, the Court acknowledged, thirty years ago, that the precedential value of its predictive opinion was limited. <u>Hakimoglu</u> at 293 ("[W]e understand that our decision here is unlikely to have -- and should not have -- lasting precedential significance. We expect that claims such as those advanced by the plaintiff in this case will work their way up through the New Jersey court system and that the New Jersey appellate courts will provide a definitive answer to the question before us.")

FanDuel's stated concern that liability in this matter allows any player claiming addiction to sue a casino is absurd in the context of the allegations of this case. Unless FanDuel concedes that it employs the same tactics with all of its players that it employed with the Plaintiff such as: a) using a secret cell phone, b) breaking bonus payments into parts to avoid detection, c) providing a ceaseless string of enticements totaling over $1,000,000, d) circumvention by the VIP host of its compliance department's own verification of funds request, and e) ignoring a highly suspicious string of deposits totaling over $20,000,000 -- then there is no such concern. Moreover, the Plaintiff does not merely claim to be addicted, he was formally diagnosed with severe gambling disorder by the Florida Recovery Center. *See* ¶29. FanDuel is certainly entitled to challenge that diagnosis during discovery as a defendant would with any proffered medical expert.

**F.**

**Plaintiff's Liability for the Money at Issue is an Out-of-Pocket Loss Under FDUTPA**

FanDuel presents cases dismissed under the FDUTPA where the plaintiff had no financial loss or responsibility for that loss. For example in Calderon v. Sixt Rent a Car, LLC, 114 F.4th 1190, 1209 (11th Cir. 2024), none of the three plaintiffs had any responsibility for the charges at issue: "Calderon refused to pay his invoice and the charges were dropped by Sixt; Marin's invoice was split between his insurer and his employer; and Borel's invoice was paid wholly by her employer." While the Plaintiff in the instant matter may not have paid out of his own pocket in the conventional sense, he remains liable for the money just as though he had. FanDuel provides no caselaw, and Plaintiff has found none, which would preclude a recovery under these circumstances.

Finding the Plaintiff's losses to be out-of-pocket for purposes of the FDUTPA is perfectly consistent with those Florida District Courts of Appeal cases "that have categorically held that a plaintiff need not be a consumer in order to bring a FDUTPA claim -- showing that what matters for a FDUTPA claim is who made the payment." *See* Calderon at 1211 *citing* Allstate Ins. Co. v. Auto Glass Am., LLC, 418 F. Supp. 3d 1009, 1018 (M.D. Fla. 2019); Bailey v. St. Louis, 196 So. 3d 375, 382 (Fla. 2d DCA 2016); Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc., 187 So. 3d 868, 869 n.2 (Fla. 3d DCA 2016); Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc., 169 So. 3d 164, 169 (Fla. 4th DCA 2015). It is not necessarily the party who paid out of its pocket which may sue under the FDUTPA, but any party who has suffered an injury-in-fact. *See* Calderon at 1212.

As correctly pointed out by FanDuel in its papers, the Plaintiff in the instant matter is presently a defendant in a matter pending in Florida state court brought by his former employer

seeking approximately $60,000,000 which includes reimbursement of the deposits at issue in the instant matter. ¶251. The Plaintiff is ultimately responsible for the money taken by FanDuel -- that it did not initially come from his pocket is immaterial under the FDUTPA.

FanDuel's argument concerning the difference in value between the services bargained for and services received is immaterial in an instance such as this one where the services were not just valueless to the Plaintiff, but actively harmful. Trained in gambling addiction, FanDuel fully knew the Plaintiff would ultimately lose everything he deposited.

### G.

### Civil Conspiracy

Opposition on this point is intentionally omitted by the Plaintiff.

### <u>CONCLUSION</u>

For the reasons set forth herein, FanDuel's motion to dismiss should be denied in its entirety.

Dated: March 21, 2025

LITT LAW, LLC

_____
By: Matthew R. Litt, Esq.
Mailing Address:
789 Farnsworth Avenue
Bordentown, New Jersey 08505
Phone: (908) 902-7071
MLitt@LittLaw.Net

<u>WORD COUNT CERTIFICATION</u>

I hereby certify that the total number of words in this memorandum of law, excluding the caption, table of contents, table of authorities, signature block, and word count certification is 7,362.

_____

Matthew R. Litt