UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                         :

AMIT PATEL,                           :

                                 :

                     Plaintiff,     :

                                 :            24-CV-7402 (VSB)

           - against -           :

                                 :          **OPINION & ORDER**

                                 :

FAN DUEL, INC., *et al.*,         :

                                 :

                    Defendants.  :

                                 :
-------------------------------------------------------X

Appearances:

Matthew Roye Litt
Litt Law, LLC
Bordentown, NJ
*Counsel for Plaintiff*

Vineet Bhatia
Susman Godfrey LLP
Houston, TX

Jason Bell
Susman Godfrey LLP
New York, NY

Stephen Edward Morrissey
Susman Godfrey LLP
Seattle, WA
*Counsel for Defendant Fan Duel, Inc.*

VERNON S. BRODERICK, United States District Judge:

      Before me are the motion to compel arbitration and stay the case, (Doc. 40), and the

motion to dismiss, (Doc. 43), filed by Fan Duel, Inc. ("FanDuel" or "Defendant") against Amit

Patel ("Patel" or "Plaintiff").  For the reasons articulated below, Defendant's motion to compel

arbitration and stay the case is GRANTED.  The case is stayed pending the outcome of the

arbitration.  Because I find that this case should proceed in arbitration and be stayed, Defendant's motion to dismiss is also DENIED.

### I.       Factual Background[1]

#### A.  The Parties

FanDuel is a gambling company that "offers" sportsbook, daily fantasy sports ("DFS"), horse racing, and online casino gambling in several states across the country.  (Am. Compl. ¶¶ 16–18.)  In a DFS game, players choose a team of real-life athletes and compete with other players and their choice of another team by betting money to see which team performs better.  (*Id.* ¶ 75.)  FanDuel retains 6% of all money wagered on DFS games.  (*Id.* ¶ 76.)  Indeed, FanDuel was one of the nation's "largest providers of DFS and sports betting," and generated gambling revenues of $3.23 billion in 2022 and $4.4 billion in 2023.  (*Id.* ¶¶ 19–20.)

At the time that this action was initiated, Plaintiff was a federal inmate serving a six-and-a-half-year prison sentence at the Federal Prison Camp in Montgomery, Alabama.[2]  (*Id.* ¶ 3.)  On April 2023, "Plaintiff was diagnosed with [a] severe gambling disorder by the Florida Recovery Center."  (*Id.* ¶ 29.)

#### B.  Patel's Registration with FanDuel

Patel does not dispute that he first registered to play DFS games on FanDuel on March 14, 2014.  (Doc. 40-9 ("Salabit Declaration" or Salabit Decl.") ¶ 4.)  To register, Plaintiff was

---

[1] The facts contained in this section are based upon the factual allegations set forth in the amended complaint filed on February 18, 2025, (Doc. 36 ("Amended Complaint" or "Am. Compl.")), and affidavits in support of Defendant's motion to compel arbitration, (*see* Doc. 40).  *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (In a motion to compel arbitration, which applies a "standard similar to that applicable for a motion for summary judgment," courts may "consider[] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits." (internal quotation marks omitted)).

[2] The Federal Bureau of Prisons inmate locator database reflects that Plaintiff is no longer in BOP custody.  *See Find an Inmate*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Apr. 13, 2026).

required to accept FanDuel's Terms of Use.  (*See* Docs. 40-1 (Affidavit of Jason Bell) ¶ 3; 40-3 (screenshot of registration page states:  "By signing up, you confirm that you are at least 18 years of age and agree to the Terms of Use.").)  As of the date of registration, the operative Terms of Use (the "2014 Terms of Use") provided, in relevant part:  "IMPORTANT NOTICE:  THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION AND A WAIVER OF CLASS ACTION RIGHTS AS DETAILED IN SECTION 15."  (Doc. 40-8 ("2014 Terms of Use") at 1.)

Section 15 of the 2014 Terms of Use stated:  "PLEASE READ THIS SECTION CAREFULLY – IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT OT FILE A LAWSUIT IN COURT."  (*Id.* at 7.)  Section 15 further explained that FanDuel's Customer Support Department will be available as an "Initial Dispute Resolution" for any concerns a customer may have.  (*Id.*)  However, Section 15 required "binding arbitration" by the American Arbitration Association "as the sole means to resolve claims" if they are not resolved in the Initial Dispute Resolution through the Customer Support Department.  (*Id.*)  Notably, the 2014 Terms of Use granted the customer "the right to opt-out and not be bound by the arbitration and class action waiver provisions set forth above," only if such opt-out notice is sent "within 30 days of 08/20/2013 or your first use of the [FanDuel] Site, whichever is later."  (*Id.* at 8.)  Otherwise, the customer will "be bound to arbitrate disputes in accordance with the terms of those paragraphs."  (*Id.*)

Plaintiff also does not dispute that FanDuel updated its Terms of Use on October 9, 2020 (the "2020 Terms of Use" or "2020 Terms" or "Terms").  (Salabit Decl. ¶ 10.)  FanDuel's active users were notified about this update on December 16, 2020.  (*Id.*)  The Terms stated that they covered the "Service" that FanDuel provided, which was defined to include FanDuel's website, "the mobile app and any other features, tools, materials or other services (including co-branded

3

or affiliated services) offered from time to time by FanDuel." (Doc. 40-11 ("2020 Terms") at 2.) Like the notice in the 2014 Terms of Use, the 2020 Terms of Use stated: "IMPORTANT NOTICE: THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION AND A WAIVER OF CLASS ACTION RIGHTS AS DETAILED IN SECTION 15." (*Id.*)

Section 15 of the 2020 Terms likewise provides: "PLEASE READ THIS SECTION CAREFULLY – IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT." (*Id.* at 16.) Section 15.1 further explains that a Customer Support Department would be available as part of an "Initial Dispute Resolution" to resolve customers' concerns." (*Id.* at 16–17.) The Initial Dispute Resolution section was amended to provide that "[f]ailure to engage in this process could result in the award of fees against you in arbitration." (*Id.* at 17.) Furthermore, Section 15.2 required arbitration by JAMS "as the sole means to resolve claims" if they are not resolved in the Initial Dispute Resolution. (*Id.*) Section 15.2 clarifies that arbitration is required for "all claims arising out of or relating to these Terms (including their formation, performance and breach), the parties' relationship with each other and/or [the customer's] use of the Service." (*Id.*) Section 15.2 also states that the arbitrator, "and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including . . . whether a claim is subject to arbitration." (*Id.*) Finally, like the 2014 Terms of Use, the 2020 Terms gave the customer "the right to opt-out and not be bound by the arbitration and class action waiver provisions set forth above by sending written notice" of the opt-out decision, only if such notice is sent "within 30 days of 08/20/2013 or [the customer's] first use of the [FanDuel] Service, whichever is later, otherwise you shall be bound to arbitration disputes in accordance with the terms of those

paragraphs."[3]  (*Id.* at 19.)

### C.  Plaintiff's Gambling Habits on FanDuel

Between late 2019 and early 2023, Patel gambled over $20 million on FanDuel's DFS games.  (Am. Compl. ¶ 50.)  These bets involved Patel making approximately 1,077 deposits, with each deposit in the amount of $25,000.  (*Id.* ¶¶ 88–89.)  Plaintiff claims that, no later than July 19, 2021, FanDuel "actively participated in and grew" his gambling addiction by enticing him with gambling credits and gifts.  (*Id.* at 1–2.)

Patel alleges that FanDuel designated him as a VIP around 2021, and assigned him a VIP Account Manager Brett Krause ("Krause").  (Am. Compl. ¶¶ 9, 23.)  Patel states that he and Krause communicated frequently between 2021 and 2023, often "as much as 100 times every day."  (*Id.* ¶ 10.)  On some occasions, Krause contacted Patel to ask why he was not gambling that day.  (*Id.* ¶ 11.)  Defendant also gave Patel approximately $1.1 million dollars in FanDuel credit that he could use to continue gambling.  (*Id.* ¶ 40.)  For example, if Plaintiff deposited $600,000, then FanDuel would give him a credit of $60,000.  (*Id.* ¶¶ 41–42.)  Plaintiff provides a long list of FanDuel credits he received.  (*See id.* ¶¶ 130–237.)  Patel claims that this credit system was a "custom clandestine enticement scheme," (*id.* at 1), created "specifically" for him, (*id.* ¶ 43).  Moreover, Krause offered Patel free DFS contest entries if Patel made 150 entries— the maximum allowed—into a single DFS contest.  (*Id.* ¶ 12.)

Finally, Patel claims that FanDuel gifted him with all-expenses-paid trips to various events including a Formula One Grand Prix event in Miami, the National Collegiate Athletic Associations' football National Championship game in January 2023, the Masters Tournament in 2021 and 2022, and the National Football League's Super Bowl.  (*Id.* ¶¶ 44–47.)  These paid-for

---

[3] As of January 17, 2025, FanDuel has not received any opt-out notice from Plaintiff.  (Salabit Decl. ¶ 9.)

trips were in addition to other gifts including a "customized basketball jersey." (*Id.* ¶ 48.)

Patel makes various claims—which FanDuel disputes—that FanDuel "knew" of his gambling issues because it "engaged with him through email, telephone, and text message on an almost daily basis." (*Id.* ¶ 35.) Patel states that FanDuel flagged "one or more of Plaintiff's transactions" as suspicious in 2023. (*Id.* ¶ 61.) At that time, Krause told Patel that FanDuel's anti-money laundering department was required to verify the source of funds that Patel deposited. (*Id.* ¶¶ 62–63.) Several days later, although Plaintiff had not provided the requisite verification, "FanDuel informed Plaintiff that 'We got around it' and 'you owe me big time' or words to that effect," and that Patels' verification was no longer required. (*Id.* ¶ 64.)

Patel also claims that FanDuel had an internal policy prohibiting refunds of deposits to the credit card that made the deposit if that consumer's account was not net-positive. (*Id.* ¶ 70.) Even so, Patel avers that FanDuel violated its internal policies by refunding the same card that Patel used to make deposits—a corporate credit card—almost 300 times, with each refund being for $25,000 for a total of about $6.75 million. (*Id.* ¶¶ 69, 72–73.) Krause conceded to Plaintiff multiple times that "FanDuel was 'breaking AML by giving refunds back to the credit card' or words to that effect." (*Id.* ¶ 71.)

## II.    **Procedural History**

On October 1, 2024, Plaintiff filed a complaint against FanDuel; Flutter Entertainment, PLC; Fox Corporation; Boyd Gaming Corp.; XYZ Corps. 1–10; and John Does 1–10. (Doc. 1.) On January 3, 2025, Plaintiff filed notices of voluntary dismissal of Fox Corporation and Boyd Gaming Corp. as defendants, (Docs. 19–20), and those two defendants were subsequently dismissed, (Doc. 23).

On January 17, 2025, Defendant FanDuel moved to compel arbitration and stay the case.

6

(Doc. 28.)  That same day, Defendants FanDuel and its corporate affiliate Flutter Entertainment PLC moved to dismiss the complaint.  (Doc. 31.)

On February 6, 2025, I endorsed Plaintiff's letter granting his request for an extension to file an amended complaint.  (Doc. 35.)  In that same endorsement, I asked Defendants to submit a letter explaining whether the pending motion to dismiss is moot if Plaintiff filed an amended complaint.  (*Id.*)  On February 19, 2025, Defendants confirmed that their initial motion to dismiss was moot because Plaintiff had filed the Amended Complaint the previous day and requested permission to file a renewed motion, (Doc. 37), which I granted the next day, (Doc. 38).

On February 18, 2025, Plaintiff filed the Amended Complaint, dropping Flutter Entertainment PLC as a defendant, and naming only FanDuel; XYZ Corps. 1–10; and Jane and John Does 1–10 as defendants.  (*See* Am. Compl.)  The Amended Complaint contains four causes of action.  Plaintiff's first claim is for violation of the Florida Deceptive and Unfair Trade Practices Act ("UDAP").  (*Id.* ¶¶ 241–52.)  In support of this claim, Plaintiff asserts that FanDuel's conduct of sending Plaintiff various enticements, gifts and circumventing its internal know-your-customer and anti-money laundering and consumer due-diligence policies, constituted unconscionable acts or unfair or deceptive acts in violation of the Florida UDAP. (*Id.* ¶¶ 246–49.)  Plaintiff's second claim is for negligence, alleging that FanDuel breached the duty of care it owed to consumers including Plaintiff by offering various gambling-related incentives and credits.  (*Id.* ¶¶ 253–62.)  Plaintiff's third claim is for intentional infliction of emotional distress, alleging that Defendant's conduct caused Plaintiff severe emotional distress. (*Id.* ¶¶ 263–69.)  Plaintiff's fourth claim is for conspiracy to commit an unspecified tort.  (*Id.* ¶¶ 270–77.)

On February 21, 2025, Defendant filed a motion to compel arbitration and stay the case. (Doc. 40 ("Mot.").) Defendant's motion included, among other things, a declaration from Customer Experience Recovery Manager Ron Salabit. (Salabit Decl.) The Salabit Declaration, in turn, attached FanDuel's Terms of Use, updated as of October 9, 2020. (Doc. 40-11.)[4] On February 28, 2025, Plaintiff filed an opposition to the motion to compel arbitration and stay the case. (Doc. 41 ("Opp'n").) On March 7, 2025, Defendant filed a reply brief. (Doc. 42 ("Reply").)

Defendant moved to dismiss the Amended Complaint for failure to state a claim on March 7, 2025. (Doc. 43.) On March 21, 2025, Plaintiff filed an opposition to the motion to dismiss. (Doc. 45.) On March 28, 2025, Defendant filed a reply brief. (Doc. 46.) On April 28, 2025, Defendant filed a notice of supplemental authority, attaching a recent Third Circuit case in support of its motion to dismiss. (Doc. 47.)

### III.    **Legal Standard**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, requires courts to compel arbitration in accordance with the terms of an arbitration agreement, upon the motion of either party to the agreement, if there is no issue regarding its creation. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (citing 9 U.S.C. § 2); *see also* 9 U.S.C. § 4 (allowing a party to an arbitration agreement to petition a district court for an order compelling arbitration where a counterparty "fail[s], neglect[s], or refus[es] . . . to arbitrate" under the terms of an arbitration agreement). "Courts must rigorously enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes,

---

[4] I may consider the arbitration agreement when deciding Defendant's motion to compel arbitration. *See Pappas v. City of New York*, No. 23-CV-6010, 2024 WL 2093472, at *3 n.5 (S.D.N.Y. May 9, 2024) (citations omitted).

and the rules under which that arbitration will be conducted." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (internal quotation marks and emphasis omitted). "The FAA reflects 'a liberal federal policy favoring arbitration agreements.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks omitted).

Before compelling arbitration, courts perform a two-step inquiry that looks at contract law principles "governed by state rather than federal law." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003) (per curiam). At step one, courts look to see whether "the parties enter[ed] into a contractually valid arbitration agreement." *Id.* A "basic tenet of contract law," including in New York, is that for a contract to be binding, there must be "a 'meeting of the minds' and a 'manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019) (citing *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)). At step two, the Court first asks "whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate." *Convergen Energy LLC v. Brooks*, No. 20-CV-3746, 2020 WL 5549039, at *13 (S.D.N.Y. Sept. 16, 2020) (internal quotation marks omitted). "[I]f the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). However, if it does not, then the Court must determine whether "the parties' dispute fall[s] within the scope of the arbitration agreement." *Nackel*, 346 F.3d at 365.

"Courts deciding motions to compel arbitration apply a standard similar to that applicable for a motion for summary judgment." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022) (internal quotation marks omitted). "A court must therefore 'consider all relevant, admissible evidence submitted by the parties' and 'draw all reasonable inferences in

favor of the non-moving party.'" *Mobile Real Estate, LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 468 (S.D.N.Y. 2020) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). "A court must grant a motion to compel arbitration if the pleadings, discovery materials before the court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." *Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 561–62 (S.D.N.Y. 2013). However, the "party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010).

"In determining the scope of an arbitration agreement, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 314 (2010) (internal quotation marks omitted).

"When both a motion to dismiss and a motion to compel arbitration are before the Court, the Court should generally rule on a motion to compel arbitration before proceeding to a merits-based motion to dismiss." *Kaiser v. StubHub, Inc.*, No. 24-CV-00044, 2024 WL 3445059, at *3 (S.D.N.Y. July 17, 2024) (internal quotation marks omitted). Accordingly, I first address FanDuel's motion to compel arbitration.

## IV.    <u>Discussion</u>

A court's inquiry on whether arbitration is appropriate proceeds in two parts: (1) whether the parties agreed to arbitrate, and, if so, (2) whether a court or an arbitrator should decide if the

dispute falls within the scope of the agreement to arbitrate. *See Palmer v. Starbucks Corp.*, 735 F. Supp. 3d 407, 416 (S.D.N.Y. 2024).

### A. Agreement to Arbitrate

Plaintiff presents two arguments he claims support his assertion that he did not agree to arbitrate his claims here. Plaintiff first challenges the Salabit Declaration as insufficiently relying on business records to establish that Plaintiff agreed to the Terms of Use when he registered for DFS games in 2014. (Opp'n 15.) Plaintiff does not dispute other aspects of notice or agreement in regards to the 2014 Terms of Use; rather, he challenges only the propriety of the Salabit Declaration. According to Plaintiff, the Salabit Declaration's references to business records are "meaningless" if the records are not attached to the declaration. (*Id.*) Plaintiff also contends that Salabit cannot claim personal knowledge as the basis of his statements because he does not certify that he was employed by FanDuel in 2014. (*Id.*) I disagree. Courts routinely rely on declarations from employees attesting to business records, even if the exact records referenced were not attached to the declaration, and even if the employee does not specify dates of employment. *See, e.g.*, *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 699, 705–09 (2d Cir. 2023) (examining declaration from employee who reviewed, but did not attach, certain business records to establish requisite knowledge).

Plaintiff next argues that FanDuel fails to demonstrate that Plaintiff received a December 16, 2020 email notifying him of the updated 2020 Terms of Use. (Opp'n 16.) Rather, he contends that FanDuel makes only generalized claims that the December 2020 email was sent to "active users" without certifying that Plaintiff specifically received it. (*Id.*) This argument likewise fails. In a motion to compel arbitration, the movant "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Barrows v. Brinker Rest. Corp.*, 36

11

F.4th 45, 50 (2d Cir. 2022) (internal quotation marks omitted).  Upon a showing that such an agreement existed, the burden shifts to the opponent "who need[s] to counter with at least some evidence to substantiate her denial that an agreement had been made." *Id.* (cleaned up).  Patel did not submit a declaration stating (or other evidence indicating) that he never received the December 16, 2020 email.  Therefore, the Salabit Declaration sufficiently establishes that Plaintiff received the email.

Because Plaintiff concedes that such an email would sufficiently constitute notice about the 2020 Terms of Use, (Opp'n 16), I find that Plaintiff received notice of those terms.  Plaintiff does not dispute his manifested assent to the terms, either in his original registration in 2014 or in his continued participation in DFS games after the 2020 updates to the Terms of Use.  Patel fails to bear his burden to demonstrate that the arbitration clause here was invalid and enforceable. *See Harrington*, 602 F.3d at 124.

Accordingly, I find that the parties agreed to both the 2014 Terms of Use and the 2020 Terms of Use, including their respective arbitration provisions.

### B.  Arbitrability of Plaintiff's Claim

Patel opposes arbitration, including arbitrability, for multiple reasons.  First, Plaintiff contends that FanDuel's expansive interpretation of the coverage of the 2020 Terms of Use would render it an "infinite" arbitration clause.  (Opp'n 11.)[5]  Patel's argument is that using the phrase "the parties' relationship with each other" as a catchall for those issues which the parties never agreed to arbitrate renders the underlying agreement unenforceable under either the principles of contract formation or the unconscionability defense.  (*See id.* at 11–12.)

---

[5] Although Defendant references both the 2014 Terms of Use and the 2020 Terms of Use, Plaintiff states that it "focuses on the 2020 update" based on the Amended Complaint's allegations.  (Opp'n 6 n.1.)  In other words, Plaintiff does not challenge that the 2014 Terms of Use requires arbitration of his claims, and only disputes the 2020 Terms.  (*See* Reply 10 n.2.)  Accordingly, I reference only the 2020 Terms of Use.

Infinite arbitration clauses are contract provisions that, "if enforced according to their terms, would require arbitration of any claims between the parties, including claims without any nexus to the agreements containing the clauses." *New York Knicks, LLC v. Maple Leaf Sports & Ent. Ltd.*, No. 23-CV-7394, 2024 WL 3237563, at *8 (S.D.N.Y. June 28, 2024) (internal quotation marks and emphasis omitted) (alterations adopted)). I "need not consider, in this case, whether the [a]rbitration [c]lause presents the problem of the so-called infinite arbitration clause" because "this dispute has a plain nexus" between the 2020 Terms of Use and Plaintiff's claims. *Cloney's Pharmacy, Inc. v. Wellpartner, Inc.*, No. 23-CV-10088, 2024 WL 4349291, at *10 (S.D.N.Y. Sept. 30, 2024) (internal quotation marks omitted).

Patel relies most heavily on *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264 (S.D.N.Y. 2021) in support of his infinite arbitration clause argument. (*See* Opp'n 13.) Plaintiff's reliance on *Altice* is misplaced. *Altice* was a data-breach class action brought by current and former employees of telecommunications provider Altice after their personal identifying information was stolen in that breach. 524 F. Supp. 3d at 268. Defendant Altice moved to compel arbitration, not based on any clause in employment agreements with plaintiffs, but based on the terms and conditions of cable services agreements with its consumers. *Id.* at 273. That agreement required arbitration of "[a]ny and all disputes arising between [the consumer] and Altice, including its respective parents, subsidiaries, [and] affiliates," including "[c]laims arising out of or relating to any aspect of the relationship between [the consumer and Altice] whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory." *Id.* (internal quotation marks omitted). Judge Jesse M. Furman held that this arbitration clause did not apply to the plaintiffs' claims "to the extent that they lack any nexus to the cable service agreement — that is, to the extent that they are not brought by Plaintiffs in their

capacities as current or former Altice subscribers." *Id.* at 279 (emphasis omitted). Judge Furman emphasized that the arbitration provision was "not limited to claims 'arising out of' or 'relating to' the cable service agreement," and instead covered "'[a]ny and all disputes arising between' the customer and Altice." *Id.* at 275. Judge Furman also examined other cases declining to compel arbitration of claims where they "lack[ed] any nexus whatsoever to the agreement containing the [arbitration] clause." *Id.* at 276 (collecting cases). Judge Furman found it "[s]ignificant[]" that the motion to compel arbitration was based on cable services agreements with customers, even though plaintiffs brought claims as current or former employees of Altice. *Id.* at 273.

In contrast here, there is no mismatch between Patel's claims and the arbitration agreement between the parties. The 2020 Terms of Use involved FanDuel and Patel as a consumer, a relationship that is the essential basis for his claims here. There is a clear nexus between the 2020 Terms of Use and Plaintiff's claims because those claims are clearly "arising out of or relating to" either "these Terms," Patel's "use of the Service," or both.

Indeed, unlike in *Davitashvili v. Grubhub Inc.*—which Plaintiff cites to argue that the Terms of Use cannot relate to his claims regarding FanDuel's VIP program because the Terms do not mention these particular claims—Plaintiff's claims directly hinge on his "individualized use of [FanDuel's] website." 131 F.4th 109, 119 (2d Cir. 2025). *Davitashvili* is plainly inapposite. In *Davitashvili* the Second Circuit found that the plaintiffs' claims in the case were not directly related to their "access and use of Grubhub" because they alleged that "Defendants violated federal and state antitrust law by inducing restaurants to agree to [no-price competition clauses]," which do not relate to their individualized use of Grubhub's website and rather "concern their access and use of *other* platforms and restaurants [because] they allege that they

14

pay higher prices when ordering from these entities because of Grubhub's anticompetitive practices." *Id.* (emphasis in original). Here, there is no dispute that Patel used FanDuel's website. In contrast, plaintiffs in *Davitashvili* conceded that "some plaintiffs have well-plead claims despite never having used any of the [d]efendants' platforms." *Id.* (internal quotation marks omitted).

The other cases Patel cites are also inapplicable. Those cases considered hypothetical situations where claims for wrongful death, pickpocketing, personal injury, and even murder would fall under the so-called "infinite" arbitration clauses such that those arbitration provisions were unenforceable. (*See* Opp'n 12–14.) Unlike these hypothetical situations, where there is no nexus between the claims and the actual underlying arbitration agreement, Plaintiff's claims here involve Patel's participation in FanDuel's DFS games. Other than his misguided citation of *Altice* and other inapplicable cases, Patel does not identify any cases that present analogous factual circumstances to this case where a court denied a motion to compel arbitration on these grounds.

Next, Plaintiff also asserts two other arguments regarding the arbitrability of his claims: (1) that his claims fall outside the purview of the arbitration provision of the 2020 Terms of Use, (*id.* at 6–8); and (2) that claims of fraud and tort are not arbitrable under the Terms, (*id.* at 8–11). However, I need not evaluate these arguments, because the arbitrability of Plaintiff's claims must be addressed in arbitration. Under the FAA, there is a general presumption that the issue of arbitrability, or whether the arbitration agreement applies to a particular dispute, should be resolved by the courts. *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021). However, "[j]ust as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have

15

arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189–90 (2d Cir. 2019). "[W]hen the parties have contracted to submit the question of the arbitrability of a dispute to arbitrators, courts must respect and enforce that contractual choice." *Id.* at 190. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *DDK Hotels, LLC*, 6 F.4th at 317 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Here, Section 15.2 of the 2020 Terms of Use explicitly provides that the arbitrator has the "exclusive authority" to resolve arbitrability disputes. (2020 Terms 17 ("[T]he arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including . . . whether a claim is subject to arbitration.").) Arbitrability is unmistakably delegated to the arbitrator "where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes," and where it incorporates "rules that expressly empower an arbitrator to decide issues of arbitrability." *DDK Hotels, LLC*, 6 F.4th at 318–19. There is no doubt that the arbitrability of Plaintiff's claims of gambling-related conduct by a gambling company he registered with to play gambling-based DFS games should be addressed in arbitration. Numerous courts faced with similarly explicit statements that arbitrability is for the arbitrator have found that the parties did clearly intend the arbitrator to resolve arbitrability. *See, e.g.*, *Palmer*, 735 F. Supp. 3d at 419 (finding that an agreement that states that "the Arbitrator — and not a court or agency—shall have exclusive authority to resolve any dispute regarding the formation, interpretation, applicability, enforceability, or implementation of this Agreement, including any claim that all or part of this Agreement is void or voidable" was a clear delegation

16

of authority to the arbitrator regarding "the question of arbitrability"). Any question about the interpretation of provisions in the 2020 Terms of Use, or whether Plaintiff's claims of fraud and torts are arbitrable under the agreement are about the scope of the arbitration clauses, not "the validity . . . of the precise agreement to arbitrate," and are accordingly delegated to the arbitrator. *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (internal quotation marks omitted). Thus, I must refer this matter to arbitration without further considering whether the arbitration clause applies to the claims raised in this lawsuit.[6]

### C. *Stay or Dismissal of the Action*

Having determined that Plaintiffs claims must proceed to arbitration, I must determine whether the action should be dismissed or stayed. The Supreme Court made clear that "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Pursuant to this mandate, I will stay, rather than dismiss, the action pending arbitration. *Doe #1 v. Coll. Bd.*, 440 F. Supp. 3d 349, 358 (S.D.N.Y. 2020) (staying case pending arbitration). Having found that a stay is appropriate, FanDuel's motion to dismiss is denied. *See Glover v. Bob's Disc. Furniture, LLC*, 621 F. Supp. 3d 442, 451 (S.D.N.Y. 2022) (granting motion to compel arbitration and denying motion to dismiss as moot).

### V.    Conclusion

For the foregoing reasons, Defendant's motion to compel arbitration is GRANTED and I refer Plaintiff's claims to arbitration. The matter is hereby STAYED pending the completion of

---

[6] Because I find that the 2020 Terms of Use require arbitration of Plaintiff's claims here, including the initial question of arbitrability, I decline to opine on whether other alleged contracts between Patel and FanDuel's corporate affiliate Betfair also require arbitration. Indeed, Plaintiff himself does not address Defendant's arguments regarding "the purported Terms of Use from Betfair in the states of Kansas and Tennessee" because "[t]o the extent any acts relevant to this action took place inside Kansas and Tennessee, they were *de minimis* compared to the activity in Florida." (Opp'n 7 n.2.)

arbitration.  The parties are directed to submit a joint status letter 120 days from the date of this Opinion & Order, advising me as to the status of arbitration proceedings.

Because Defendant's motion to compel arbitration is granted, Defendant's motion to dismiss is DENIED as moot.

The Clerk of Court is respectfully directed to terminate Document 40 (motion to compel arbitration) and Document 43 (motion to dismiss amended complaint).

SO ORDERED.

Dated:         May 7, 2026
               New York, New York

_____
Vernon S. Broderick
United States District Judge